# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NICOLE BOLT COMER, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| MOSHE LEHRER a/k/a MAX LEHRER; | ) | **JURY TRIAL DEMANDED** |
| AVRAHAM LEHRER a/k/a JOE LEVIN; | ) | |
| ROSA LEHRER; and KMI GROUP, INC., | ) | |
| a New York corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Nicole Bolt Comer ("Ms. Comer") files this Complaint against **(i)** Moshe Lehrer a/k/a Max Lehrer ("Moshe Lehrer"), **(ii)** Avraham Lehrer a/k/a Joe Levin ("Avraham Lehrer"), **(iii)** Rosa Lehrer, and **(iv)** KMI Group, Inc., a New York corporation ("KMI" and, together with Moshe Lehrer, Avraham Lehrer, and Rosa Lehrer, "Defendants") and states as follows:

## PRELIMINARY STATEMENT

1. Avraham Lehrer and Moshe Lehrer (father and son) have terrorized, harassed and blackmailed Ms. Comer. Rosa Lehrer and Moshe Lehrer used KMI to maliciously prosecute civil legal proceedings against Ms. Comer in multiple Delaware courts and to commit slander of title by recording a *lis pendens* against Ms. Comer's real property in blatant disregard of Delaware law.

2. Moshe Lehrer is a former employee of Comer Enterprises, Inc., a Pennsylvania corporation ("CEI"). Ms. Comer is the sole owner, CEO and President of CEI. During the term of Moshe Lehrer's employment with CEI, Moshe Lehrer and Ms. Comer were in discussions for Moshe Lehrer to buy 49% of the stock of CEI and 49% of the stock of The Allere Group Professional Corporation, a Pennsylvania corporation ("The Allere Group") of which Ms. Comer's

father, Barney P. Bolt, Jr. ("Mr. Bolt") is the sole shareholder and Ms. Comer is the President and CEO.

3.     In the summer of 2020, Ms. Comer became aware that (i) Moshe Lehrer had defrauded her, CEI and The Allere Group, and (ii) Moshe Lehrer and Avraham Lehrer were conspiring to extort Ms. Comer.  Thus, on September 24, 2020, CEI (acting through Ms. Comer) terminated Moshe Lehrer as an employee.  Simultaneously, Ms. Comer and Mr. Bolt terminated talks with Moshe Lehrer regarding their potential stock transaction.

4.     Immediately following Moshe Lehrer's termination, Defendants commenced a campaign to reverse CEI's and Ms. Comer's decision through a repetitive drum beat of terroristic threats, harassment, blackmail, malicious prosecution of civil proceedings, and slander of title including by, upon information and belief, the following acts:  **(i)** Moshe Lehrer made an outlandishly false police report targeted at Ms. Comer; **(ii)** Moshe Lehrer harassed Ms. Comer by emailing a large list of Ms. Comer's business contacts and CEI employees a defamatory and threatening statement concerning Ms. Comer; **(iii)** Moshe Lehrer and/or Avraham Leher terrorized Ms. Comer and Mr. Bolt by sending Ms. Comer messages threatening her father's (Mr. Bolt) life; **(iv)** Moshe Lehrer and Avraham Lehrer made terroristic threats via telephone to Ms. Comer, her husband,[1] her then 20-year old daughter, at least one personal friend of Ms. Comer's, and CEI employees; **(v)** Rosa Lehrer caused KMI Group, with Moshe Lehrer's guidance and participation, to maliciously prosecute civil legal proceedings against Ms. Comer without any legal or factual justification whatsoever; and (**vi**) Rosa Lehrer caused KMI Group's attorneys to unlawfully record

---

[1] Ms. Comer and her husband are in the final stages of a long divorce process but remain professional colleagues and mutually supportive co-parents.

a bogus *lis pendens* against Ms. Comer's personal residence in hopes of frustrating an imminent sale of the property.

5.     Plaintiff seeks to put an end to Defendants' actions by requesting temporary, preliminary, and permanent injunctive relief ordering Defendants to immediately cease and desist from contacting Ms. Comer, Mr. Bolt, anyone in Ms. Comer's family, and/or anyone in Ms. Comer's social or professional orbit, as well as damages associated with Defendants' outrageous conduct.

## JURISDICTION

6.     The Court has jurisdiction over the subject matter of the above-captioned civil action (this "Action") pursuant to 28 U.S.C. § 1332.

7.     The amount in controversy in this Action, exclusive of interest and costs, exceeds the sum or value of $75,000.

8.     Venue in the District of Delaware is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the State of Delaware.

## PARTIES AND RELEVANT PERSONS

### A.     Nicole Bolt Comer

9.     Ms. Comer is an adult citizen of the State of Delaware.

10.     Ms. Comer is the founder, Chief Executive Officer ("CEO"), President, and sole owner of CEI.

11.     Ms. Comer is the CEO and President of The Allere Group.

12.     Ms. Comer is Mr. Bolt's daughter.

13.     Ms. Comer is the former owner of 12 Autumnwood Drive, Newark, Delaware.

**B.**     **Barney P. Bolt, Jr.**

14.     Mr. Bolt is the sole owner of The Allere Group.

15.     Mr. Bolt is Ms. Comer's father.

**C.**     **Comer Enterprises, Inc.**

16.     CEI is a Pennsylvania corporation with offices in Kennett Square, Pennsylvania.

17.     CEI is an outsource information technology labor provider (a staffing company) with niche specialty in the financial services sector.

18.     Ms. Comer is the sole stockholder, President and CEO of CEI.

**D.**     **The Allere Group Professional Corporation**

19.     The Allere Group is a Pennsylvania corporation with offices in Kennett Square, Pennsylvania.

20.     The Allere Group is an outsource information technology labor provider (a staffing company) with niche specialty in the financial services sector.

21.     Mr. Bolt is the sole stockholder of The Allere Group.

22.     Ms. Comer is the CEO and President of The Allere Group.

**E.**     **Moshe Lehrer a/k/a Max Lehrer**

23.     Moshe Lehrer is an adult citizen of the State of Florida.  Upon information and belief from personal knowledge and the attached Broward County Police Report No. 34-2011-180576, concerning Arrest # 20-02793 (the "Broward County Police Report"), Moshe Lehrer has a permanent address of 4020 Galt Ocean Drive 110, Fort Lauderdale, Florida, 33308.

24.     Moshe Lehrer uses the alias "Max" and is commonly known as "Max Lehrer."

25.     Moshe Lehrer has also used the aliases "Max Lear" and "Max Lehar."

26.      Moshe Lehrer is involved in the business of brokering and/or making merchant cash advance loans.  Separately, Moshe Lehrer is involved in purchases and sales of art.

27.      Moshe Lehrer is Avraham Lehrer's son.

28.      Moshe Lehrer was born on March 28, 2001 and, thus, as of the date of the filing of this Complaint, is 19 years old.

29.      Upon information and belief, Moshe Lehrer is (and has been) involved in the world of merchant cash advance lending or, at least, his name has been used in connection with merchant cash advance lending.

30.      Moshe Lehrer is involved with, at least, three separate merchant cash advance businesses with offices in Florida, California and New York.

31.      From December 5, 2018 and continuing through the date hereof, Moshe Lehrer has served and serves as manager of a merchant cash advance lending business named USD Funding, LLC (https://www.usdfunding.com/), a Florida limited liability company, with an address of 5301 North Federal Highway, Suite 395, Boca Raton, Florida, 33487.

32.      Moshe Lehrer is, or, at least as of October 1, 2020, was, involved with a merchant cash advance lending business named Shield Funding (https://shieldfunding.com/) with a New York office at 2 West 46th Street, Suite 204, Mezzanine Floor, New York, New York, 10036 and a California office at 6837 Hayvenhurst Avenue, Van Nuys, California, 91406.

33.      Moshe Lehrer serves as registered agent of – and is otherwise involved with – a merchant cash advance lending business named TGVZG LLC, a Florida limited liability company with an address of 3300 Port Royale Drive, Apartment 349, Fort Lauderdale, Florida, 33308.

F. **Avraham Lehrer a/k/a Avi Lehrer a/k/a Joe Levin**

34.     Avraham Lehrer is an adult citizen of the State of Florida who, upon information and belief resides at 4020 Galt Ocean Drive 110, Fort Lauderdale, Florida, 33308.  In addition, Avraham Lehrer may continue to maintain a residence at 12 Rockingham Road, Spring Valley, New York, 10977-1114.

35.     Avraham Lehrer is Moshe Lehrer's father.

36.     Avraham Lehrer uses the alias "Joe Levin" and also is known as "Avi Lehrer."

37.     Avraham Lehrer, using the alias "Joe Levin," holds himself out as a private investigator operating as T.O.T. Consulting Services.  See http://www.totpi.com/.

38.     However, in Avraham Lehrer's alternative world where he pretends to be "Joe Levin," his credentials, honesty and qualifications as a private investigator have been called into question by at least one source.  See https://totpiexposed.wordpress.com/totpiscam/ ("Joe Levin is not who you think, the man's real name is Avraham Lehrer and has gone by other names before, he's done this because he's had some run-ins with the law for bribery, and corporate espionage against a Jewish business. It has become a common thing for him to change his name, with all the laws broken, scams, and just ripping people off, he's constantly forced to change his name. He's a fraud, and scam artist who's taken money from hard working Jewish families, and left them with nothing in return. He's supposed to be a big Private Investigator but turn's out he doesn't even have a Private Investigator's license; himself and his business TOTPI are scams. His helicopters he has pictured, and undercover car's aren't his. It's all phony advertising to suck people in that are in need of help, they are not provided any solutions to their problems. Don't let Joe Levin aka Avraham Lehrer trick you, I'm sure his next name change is right around the corner!").

39.     Upon information and belief based on news reports, Avraham Lehrer was charged in 2011 for attempting to bribe a secretary to copy computer files containing information pertaining to her employer.  See https://nypost.com/2011/07/18/pi-busted-as-kosher-spy/ ("Avraham Lehrer, 36, was charged last Thursday with offering a secretary at Shop Delight in Great Neck a $1,000 bribe to copy computer files full of information on suppliers, prices and customers.").

40.     Upon information and belief based on the Broward County Police Report, Avraham Lehrer is alleged to have been involved with his son, Moshe Lehrer in, at least, one violent crime.  As stated in the "Probable Cause Affidavit" section of the Broward County Police Report, Avraham Lehrer played an integral in the incident leading to his then 19-year old son's (Moshe Lehrer's) arrest on November 25, 2020 (emphasis added):

> The defendant, 19 [year old] LEHRER, *and his father* followed the 60 [year old] victim to his residential parking lot with the belief that the victim was hired to stalk them.  LEHRER *and his father* approached the victim and confronted him at which time the victim repeatedly said that they had the "wrong guy."
>
> The victim exited his vehicle and told them he just moved to town 2 weeks ago and has not part in what they are alleging.  LEHRER *and his father* became very aggressive making threats and scaring the victim while recording him on their cell phones.  When the victim swatted a phone from out of his face, LEHRER sprayed the victim with pepper-spray.  The victim raced back into his vehicle and tried to get away when *LEHRER's father* jumped on the hood of the victim's vehicle in a "Hollywood-style" manner to prevent him from leaving.  The victim drove away *with the father on the hood*, as LEHRER rear-ended and side-swiped the victim's vehicle with his own.  LEHRER eventually cut off the victim and forced him to stop as officers arrived on scene.  Approximately $8000 in damage was observed on the victim's vehicle.  The victim wishes to prosecute and stated that this crime was done against his will.
>
> Surveillance video and cellphone video captured this event from multiple angles and viewed by officers.  This incident was captured on BWC.

41.     Attached as **Exhibit A** is the Broward County Sheriff's Office Offense Report No. 34-2011-180576, concerning Arrest No. 20-02793, Moshe Lehrer's November 25, 2020 arrest.

42.     Upon information and belief based on review of relevant case law, Avraham Lehrer was sanctioned by the New York Supreme Court, Kings County, for frivolously commencing civil proceedings.  As stated in 762 Park Place Realty, LLC v. Lehrer, 2015 WL 1933986, at *4 (N.Y. Sup. Ct.April 29, 2015):

> Defendant also moves to impose sanctions upon plaintiff Avraham Lehrer and for an award of reasonable attorneys' fees. The authority to impose sanctions is left to the court's discretion (see Landes v Landes, 248 A.D.2d 268, 269 [1st Dept 1998]). Conduct during litigation is sanctionable if it is "completely without merit in law or fact and cannot be supported by a reasonable argument for the extension, modification, or reversal of existing law" or if "it is undertaken primarily to delay or prolong the resolution of litigation, or to harass or maliciously injure another, or it asserts material factual statements that are false" (Mascia v Maresco, 39 A.D.3d 504, 505 [2d Dept 2007]). The Court finds that sanctions are warranted here because it is undisputable that Avraham had surrendered his interest in 762 Park Place prior to bringing this action. The 2008 Agreement clearly states that this is the case, and Avraham does not dispute having signed this document. Therefore, it was frivolous for Avraham to bring the instant action and assert that he was the sole member of 762 Park Place and that Shlomo had no interest in 762 Park Place.

43.     As set forth herein, the Delaware State Police issued a warrant for Avraham Lehrer's arrest in connection with certain of the subject matter of this complaint, namely, terroristic threats against Ms. Comer.

**G.     Rosa Lehrer.**

44.     Rosa Lehrer is an adult citizen of the State of Florida who, upon information and belief resides at 4020 Galt Ocean Drive 110, Fort Lauderdale, Florida, 33308.

45.     Rosa Lehrer is Moshe Lehrer's mother.

46.     Rosa Lehrer is Avraham Lehrer's wife.

47.     Rosa Lehrer is the owner of KMI.

**J.      KMI Group, Inc.**

48.     KMI Group is a New York corporation with its principal place of business in New York.

49.     KMI is in the business of merchant cash advance lending.

50.     KMI is owned and controlled by Rosa Lehrer, Moshe Lehrer's mother and Avraham Lehrer's wife.

**FACTUAL BACKGROUND**

**A.      CEI Experienced Difficulties From 2018 through 2019 Due to Use of Merchant Cash Advance Loans to Cover Cash Flow Interruptions.**

51.     As a staffing company, CEI's business model requires that it pay its contractors every week, regardless of the fact that CEI does not get paid as regularly by its clients.  Thus, strategic management of cash flow is essential.

52.     In 2018, CEI experienced difficulties with cash flow that prompted it to use merchant cash advance ("MCA") loans to cover cash flow interruptions.  As happens with many businesses that use MCA loans, amounts due under such loans snowballed and began to affect CEI's financial structure on a deeper level than cash flow.

53.     Negotiation with the MCA lenders and managing cash flow under the overarching burden of a series of MCA loans required an inordinate amount of focus for a small business like CEI.

54.     By the summer of 2019, CEI had consulted with bankruptcy counsel and readied for a bankruptcy filing.

55.     On August 18, 2019, CEI filed for chapter 11 bankruptcy in the Eastern District of Pennsylvania to achieve a global resolution to CEI's MCA-related challenges.

**B.** **Moshe Lehrer Secured a Position Based on Fraud.**

56.   In the midst of its ill-fated experiment with MCA loans, CEI applied to a business named "Shield Funding" for funding.  In response, Ms. Comer received an email on October 24, 2018, that stated it was from "max lehar" and was signed "Max Lear."

57.   Thus, the October 24, 2018 email was Ms. Comer and CEI's first interaction with Moshe Lehrer.  Moshe Lehrer's email stated as follows:

> **From:** max lehar
> **Sent:** Wednesday, October 24, 2018 12:36 PM
> **To:** Nicole Bolt Comer
> **Subject:** Trying to reach you
>
> Hey,
> This is Max from Shield Funding. We see that you applied for some funding on our website and I have been trying to reach you.
> If you can kindly call me back at your earliest convenience so that we can get you get you funded promptly.
> Additionally, I am attaching our application. Please fill it out and send it back together with the last 4 months of your business banking statements to expedite the process.
> If you have any questions, call me at any time.
> Looking forward in working with you.
> --
> Max Lear
> (347)977-6757
> Shield Funding

58.   A true and correct copy of Moshe Lehrer's October 24, 2018 email to Ms. Comer is attached as **Exhibit B**.

59.   From October 2018 through the summer of 2019, Ms. Comer and other CEI employees maintained contact with Moshe Lehrer as he brokered merchant cash advance financings for CEI.

60.   Ms. Comer met Moshe Lehrer in person on July 1, 2019, when he appeared uninvited at her house to tell her he could help her business.

61. Thereafter, Moshe Lehrer gained access to CEI as an employee after achieving Ms. Comer's confidence through a series of intentional misrepresentations regarding his skills, abilities, experience and business relationships.

62. Moshe Lehrer misrepresented himself as having (i) financial acumen sufficient to be a chief financial officer, (ii) the ability to obtain inexpensive financing to cover periodic cash flow shortfalls, (iii) experience sufficient to guide a company such as CEI and/or The Allere Group, and (iv) the business relationships necessary to generate new business for CEI and/or The Allere Group.

63. In reliance on Moshe Lehrer's misrepresentations, in July 2019, Ms. Comer and Mr. Bolt entered into talks with Mr. Lehrer to purchase 49% of the stock in CEI and 49% of the stock in The Allere Group. In exchange for the stock, Mr. Lehrer promised to make a $600,000 investment into CEI and/or the Allere Group.

64. Over the course of the following year, Ms. Comer noticed that Moshe Lehrer did not ever perform the work of a chief financial officer, obtain inexpensive financing, provide any valuable or meaningful contributions to the leadership of CEI and/or The Allere Group, or generate any new business for CEI and/or The Allere Group. Ms. Comer realized over the course of that year that all Moshe Lehrer did was broker exorbitantly expensive merchant cash advance loans for CEI. In addition to all of the foregoing, Moshe Lehrer did not make his promised $600,000 capital contribution to either or both of CEI and/or The Allere Group.

65. In addition, although Moshe Lehrer visited the offices with some regularity from September 2019 through February 2020, from and after the onset of the global COVID-19 pandemic, it was obvious that Moshe Lehrer stopped doing anything whatsoever for CEI or The Allere Group.

66.     Moshe Lehrer fancied himself as a middle man for CEI's negotiations with MCA lenders.  In reality, Moshe Lehrer acted as a broker for more high-interest MCA loans, all for his own benefit.

**C.     Moshe Lehrer Pushed for CEI to Engage "Joe Levin" to Perform Services for CEI Without Ever Telling Ms. Comer that "Joe Levin" Was an Alias for Avraham Lehrer, Moshe Lehrer's Father.**

67.     On numerous occasions after gaining interior access to CEI and The Allere Group, Moshe Lehrer recommended to Ms. Comer that she engage the services of a man named "Joe Levin" to perform services for CEI and/or The Allere Group.

68.     Moshe Lehrer never told Ms. Comer or anyone else at CEI that "Joe Levin" was actually his father, Avraham Lehrer.

69.     In July 2019, at Moshe Lehrer's suggestion, Ms. Comer engaged "Joe Levin" to provide protection for her and her family after receipts of odd threats to her and her family.  Neither Ms. Comer nor anyone in her family ever received any threats before Moshe Lehrer and "Joe Levin" appeared in their lives.

70.     In the spring of 2020, "Joe Levin" contacted Ms. Comer and gave her unsolicited advice regarding how to manage funds related to CEI's paycheck protection ("PPP") loan in the spring of 2020.  "Joe Levin" later told Ms. Comer that his unsolicited advice was worth $75,000 and demanded that CEI pay him that amount.  Moshe Lehrer supported "Joe Levin's" demand for $75,000.

71.     In the summer of 2020, "Joe Levin" contacted Ms. Comer and told her that he needed to be compensated for his help with CEI's negotiations with MCA lenders.

72.     Ms. Comer was incredulous at "Joe Levin's" demand for payment.

73.    In response, "Joe Levin" continued to argue that he should be paid for services he alleged he provided to CEI and/or Ms. Comer and that he wanted to "keep it civil."

74.    Ms. Comer told Moshe Lehrer that "Joe Levin's" suggestion felt like a shakedown and she would not pay "Joe Levin" because "Joe Levin" did not do anything for CEI.

75.    In response, Moshe Lehrer strenuously advocated for paying "Joe Levin" and said that "Joe Levin" should be paid $100,000 over twelve (12) months for services allegedly provided.

76.    Moshe Lehrer never told Ms. Comer that "Joe Levin" is actually his father – or that "Joe Levin's" real name is Avraham Lehrer.

77.    "Joe Levin" also never told Ms. Comer that his real name is Avraham Lehrer or that he is Moshe Lehrer's father.

**D.    Ms. Comer, CEI and The Allere Group Terminated All Relationships and Interactions with Moshe Lehrer.**

78.    On September 24, 2020, Ms. Comer met with Moshe Lehrer at the offices of CEI and The Allere Group in Kennett Square, Pennsylvania, and informed Moshe Lehrer that he was terminated from his employment with CEI and that Ms. Comer and Mr. Bolt were terminating all talks toward Moshe Lehrer's purchase of 49% of the stock of CEI and/or The Allere Group (the "Termination Meeting").

79.    Ms. Comer was accompanied at the Termination Meeting by CEI's corporate attorney, CEI's chief operations officer, and a personal friend.

80.    When Ms. Comer told Moshe Lehrer the reasons for his termination, primarily the fact that he is a fraud, Moshe Lehrer stated, "I can explain all of my lies."

81.    Moshe Lehrer was irate at the Termination Meeting and threatened Ms. Comer before leaving the room.

E.  **Following the Termination Meeting, Moshe Lehrer and Avraham Lehrer Terrorized Ms. Comer and her Family, in an Attempt to Extract a Settlement from Ms. Comer.**

1.  **False Police Report**

82.  Moshe Lehrer's and Avraham Lehrer's campaign of terror against Ms. Comer started with a false police report.

83.  Immediately following the Termination Meeting, Moshe Lehrer walked across the street to the Kennett Square Police Station (Borough of Kennett Square) and made an outlandishly false and defamatory police report against Ms. Comer.  Specifically, Moshe Lehrer falsely reported to the Kennett Square Police Department that Ms. Comer sexually assaulted him when he was a minor after prying him with copious amounts of alcohol.

84.  Ms. Comer did not meet Moshe Lehrer in person until after he was eighteen (18) years old.  Ms. Comer never had sex with Moshe Lehrer.

2.  **Relying on Moshe Lehrer's False Police Report and Other False Statements, "Joe Levin" and Moshe Lehrer Blackmailed Ms. Comer.**

85.  Next, Moshe Lehrer's and Avraham Lehrer's campaign of terror moved to blackmail.

86.  Shortly after the Termination Meeting on September 24, 2020, Avraham Lehrer, still posing as "Joe Levin," texted Ms. Comer the following text, furthering his and Moshe Lehrer's refrain of "sexual abuse" and/or "underage soliciting" and other untrue statements, all of which have continued throughout their campaign of terror against Ms. Comer:

> Good morning Nicole,
> I hope you are having a beautiful morning as I am myself.
> I know that your broke, and most likely paying your lawyer with sex.
> I'm just curious if he's still next to you…?
> Maybe he can help you answer these questions:
> How many years are you facing for underage soliciting?

How many years are you facing in federal prison for lying to the
bankruptcy court?
How many years are you facing for laundering money, wire fraud,
and tax evasion?
And how many years are you facing for hiring a hit man to kill your
husband Mark?

When he gives you these answers, I hope you'll be able to enjoy the
rest of your day. Because you have absolutely no idea what you just
did to yourself.

Wishing you a great rest of your day!
With much love,
Joe

87.     A true and correct copy of the text sent September 24, 2020 at 11:35 a.m. from

Avraham Lehrer, posing as "Joe Levin," to Ms. Comer is attached as **Exhibit C**.

88.     From October 1, 2020 through October 7, 2020, Avraham Lehrer, still posing as

"Joe Levin," sent another round of texts to Ms. Comer, plainly attempting to blackmail her with

Moshe Lehrer's and his refrain of untrue statements concerning Ms. Comer's character.  A true

and correct copy of the texts sent between October 1, 2020 and October 7, 2020, from Avraham

Lehrer to Ms. Comer is attached as **Exhibit D**.

### 3.     Death Threats and other Terroristic Threatening Voicemails.

89.     Moshe Lehrer's and Avraham Lehrer's campaign of terror against Ms. Comer then

transitioned to death threats.

90.     On September 25, 2020, someone "spoofed" Ms. Comer's daughter's telephone

number (making the call appear as it was coming from her daughter's cell phone).  During that

call, a male individual told Ms. Comer that he was going to blow her head off.

91.     Ms. Comer recognized the voice on the other end of the line as "Joe Levin" (now

known to be Avraham Lehrer).

92.     Ms. Comer reported the death threat to the Delaware State Police.

93.     Subsequent to further investigation, relevant Delaware law enforcement authorities issued a warrant for Avraham Lehrer's arrest.  Attached as **Exhibit E** is a print-out of publicly available information concerning Warrant No. 0620005390, DUC no. 2010006528, for the arrest of Avraham Lehrer.

94.     On October 14, 2020, Ms. Comer's husband (also an employee of CEI), daughter, executive assistant at CEI, chief operating officer of CEI, former financial manager and outside corporate attorney all received terrifying communications.

95.     The voicemail to Ms. Comer's executive assistant stated as follows:

> Hey Liz – listen – you f**k with the wrong people.  Nicole f**k with the wrong people and so did you and you're going to f**kin' go down for it.  You f**kin' hear me?  I know where you f**kin' live.  I'm gonna come there and slit your f**kin' throat.  You f**kin' dumb bitch.

96.     The voicemail to Ms. Comer's husband, also a co-worker of Ms. Comer's, stated as follows:

> Hey Marc – How you doing aah?  Listen you f**k with the wrong motherf**kin' people.  I'm gonna come after you so f**kin' hard you ain't gonna f**kin feel [indecipherable] I'm gonna cut your f**kin' dick off and send it to your f**kin' daughter, you f**kin' hear me?  Do not f**k with the wrong people.

97.     The voicemail to Ms. Comer's daughter (then 20 years old) stated as follows:

> Hey Natalie – listen – tell your mother she better do the right thing before it's too late.  No more f**kin' money, no f**kin' people can protect her anymore.  You hear me?  If you love your mother, tell her to do the f**kin' right thing.

98.     The voicemail to Ms. Comer's personal friend stated as follows:

> Hey Sharon how you doin' – listen – I hope you enjoyed your trip to Bermuda wit' Nicole.  Next time I f**kin' see you with her, I'm gonna f**kin kill you.  You f**kin' hear me?  You ain't f**kin' with the wrong people ever again.

99.    The voicemail received by CEI's corporate attorney stated as follows:

> Hey Joe – I hope you enjoy Nicole's f**kin' pussy.  Listen – I'm
> coming after you.  I'm gonna cut your f**kin' dick off and put it in
> her f**kin' corpse.  You f**kin' hear me?  You're both gonna be
> f**king dead.  Stop f**kin' with the wrong people.

100.    Moshe Lehrer is the only common thread between all of the people that received voicemails on October 14, 2020.  Moshe Lehrer knew all of the people who received voicemails.

101.    In addition, Moshe Lehrer is the only person outside of CEI that knew the identity of CEI's corporate attorney – because he attended the Termination Meeting.  In fact, CEI had never had any interaction with the attorney that attended the Termination Meeting prior to his work to prepare for the Termination Meeting and otherwise concerning CEI's interactions with Moshe Lehrer.

102.    Neither Ms. Comer, CEI, nor The Allere Group is or has been involved in any violently contentious matters nor has either of them had any significantly adverse interactions with anyone – except Moshe Lehrer.

103.    Avraham Lehrer's and Moshe Lehrer's death threats and harassment were always coupled with timely emails imploring Ms. Comer and to settle with them.  Their texts were often laced with attempts to blackmail Ms. Comer with outlandishly false accusations.

104.    One such text From Avraham Lehrer to Ms. Comer's husband, received on September 25, 2020, continued with the same refrain of untrue allegations against Ms. Comer, including the preposterous allegation of "underage sexual relations."   Avraham Lehrer's September 25, 2020 text to Ms. Comer's husband stated as follows:

> Good afternoon Mark,
> From the very first time I met you, I noticed the level your
> intelligence and intellect.  For that alone, I hope you decide to relay
> some smart advice to Nicole.

> You and I both know that there is no way she getting away with all
> of this. Especially considering the $700k that Max put down
> recently, plus more.
> There is plenty against her right now from money laundering, tax
> evasion, wire fraud, underage sexual relations, and the list goes
> on….
> For children to see their own mother being accused/indicted on such
> charges can be horrifying, embarrassing, and detrimental.
> There's a way to avoid this, I just hope that you choose to try and
> help her see that.

105. A true and correct copy of the September 25, 2020 text from Avraham Lehrer to

Ms. Comer's husband is attached as **Exhibit F**.

106. Moshe Lehrer also continued to beg for a settlement of his purported claims against

Ms. Comer. One such text, received by Ms. Comer's husband on September 26, 2020, stated as

follows:

> Good morning
> I know you have clear instructions not to answer. But in matter of
> the fact you're the only one that can fix this. Trust me and call me.
> You dont have to speak just listen
> I promise you 5min wont' do any harm
> Don't call me later when it's too late
> This is a rookie mistake
> Please send me your attorneys info we believe you were apart of this
> scam

107. A true and correct copy of the September 26, 2020 text from Moshe Lehrer to Ms.

Comer's husband is attached as **Exhibit G**.

108. On January 21, 2021 Avraham Lehrer and/or Moshe Lehrer sent a barrage of

harassing, defamatory and not-so-subtly threatening texts to Ms. Comer's, CEI's and The Allere

Group's business contacts. The January 21, 2021 emails and texts continued Avraham Lehrer's

and Moshe Lehrer's blackmail regarding "sexual misconduct and abuse." It is not yet known how

many such texts and emails were sent. The texts of which Ms. Comer is aware all stated as follows:

> Hello [name]

> You are receiving this message in regards to your affiliation with Nicole comer.
> As you may be aware, Nicole has been implicated recently in a slew of unscrupulous business dealings in addition to sexual misconduct and abuse allegations.
> This is a warning to you that as the situation proceeds we are not concerned with collateral damage.  For your own sake do not be deluded by alignments and predispositions; Nicole must be avoided at all costs.

109.    The texts sent on January 21, 2021 all purport to be signed with a reference to an infamously treacherous gang.  But it is clear that these messages emanated from either Moshe Lehrer and/or Avraham Lehrer because:  (i) Ms. Comer is not and has not been in any significant conflict with anyone other than Moshe Lehrer and Avraham Lehrer; (ii) Ms. Comer has never been the subject of any allegations of sexual misconduct or abuse except for the outlandishly false and defamatory allegations stated by Moshe Lehrer and Avraham Lehrer; and (iii) the texts were sent to a relatively recent list of CEI business contacts – which are known to Moshe Lehrer by virtue of his now-terminated access to CEI and The Allere Group business.

110.    In the midst of the barrage of defamatory texts and emails to Ms. Comer's business contacts on January 21, 2021, Moshe Lehrer texted Ms. Comer a picture of a computer monitor showing a portion of a spreadsheet of CEI business contacts with red lines superimposed, scratching out the names with smiley faces with hearts in place of eyes.

111.    A true and correct copy of the text with the photo sent by Moshe Lehrer to Ms. Comer is attached as **Exhibit H**.

### 4.        **Escalated Violence**

112.    As later discovered by Ms. Comer and Mr. Bolt, on January 29, 2021, Avraham Lehrer and Moshe Lehrer's campaign of terror against Ms. Comer took on a markedly new level of violence and extended to Ms. Comer's father, Mr. Bolt.

113.    On January 30, 2021, Mr. Bolt received an unsolicited visit from the Delaware State Police at his home in Delaware.  Mr. Bolt was told that the Delaware State Police had received a call from the Pennsylvania State Police that there were two incidents in Pennsylvania the night before (on January 29, 2021) concerning two individuals who were demanding information concerning Mr. Bolt's whereabouts.  The representative of the Delaware State Police said that he was there to make sure Mr. Bolt was okay.

114.    Thereafter, Ms. Comer and Mr. Bolt inquired of the Pennsylvania State Police to obtain the facts of what happened on January 29, 2021 in Pennsylvania.

115.    Ms. Comer and Mr. Bolt learned that there were two incidents and was told the following by the Pennsylvania State Police:

- In the first incident, two men forced their way into a home where Mr. Bolt lived previously, brandished a fire-arm and demanded that the current resident tell them where Mr. Bolt lives.  During this incident, the two men stated that Mr. Bolt's daughter is the subject of sexual abuse allegations.

- In the second incident, two men were caught trying to break into another home where Mr. Bolt lived previously and were run off into the night after being seen by a neighbor.

116.    On February 4, 2021, Ms. Comer received a text, referring to one of Mr. Bolt's previous addresses involved in the incidents of January 29, 2021, which stated as follows:

Find out what happened at 143 honey.  Lucky day for your dad.  I
assure You Next time there will be no mistake on the address.
See you soon

117.    The February 4, 2021 text concerning Ms. Comer's father and "143 honey" purports to be signed by a well-known violent street gang but it is clear that the text received February 4, 2021 emanates from Avraham Lehrer and Moshe Lehrer because: (i) it makes clear that the incidents of January 29, 2021 were an effort to terrify Ms. Comer; (ii) the men who forced their way into one of the homes on January 29, 2021 explicitly mentioned Avraham Lehrer and

Moshe Lehrer's continued refrain of bogus allegations against Ms. Comer of sexual assault and

abuse; (iii) Ms. Comer has never before and never since been accused of sexual misconduct;

(iv) Ms. Comer had never before and never since had any interactions with anyone that would get

so heated as to prompt a violent home invasion, other than her ongoing experience with Avraham

Lehrer's and Moshe Lehrer's campaign of false police reporting, blackmail and terroristic threats.

118.    A true and correct copy of the text received by Ms. Comer on February 4, 2021

concerning Ms. Comer's father and "143 honey" is attached as **Exhibit I**.

119.    Also on February 4, 2021, Ms. Comer received another text from multiple different

phone numbers, which were all clearly sent by Avraham Lehrer, stating as follows:

> Hi Nicole
> Hope all is well.  It has been some time since we last connected.
> As you are aware you are getting pretty close to an expiration date.
> Just to remind you of all your business adventures you Nicole
> Comer are responsible for.
>    1.  Regarding the loan you received from PPP it is a full
> fledge fraud you know.  The good news is that the government
> offered to the public 30% of the total loan to anyone reporting fraud.
>    2.  In reference to the Silvercup, bankruptcy case it will be
> reopened.
>    3.  Regarding Santander and Mr. Hecht the proof of you
> committing fraud is on the table.
>    4.  Regarding all personal and sexual assault charges with
> Max will be handled by my lawyer.
>    5.  In reference to your lawyer Joe I am happy that you are
> getting your desirable needs taken care of for your pleasure.
>    6.  In reference to your bankruptcy lawyer Rob your personal
> needs are a huge game player but you so kindly manipulated
> him that you forgot to tell him the truth.  He will have no choice but to
> go tell the judge the truth.
>    7.  Regarding your two beautiful children may god bless
> them with health wealth and happiness.
> Your daughter Natalie who has unfortunately never met her
> biological dad and your son Max, two pure souls.  Why would a
> devoted caring mom want to give her children more pain?
> Why would a daughter want to drag her special needs father (who
> got naked in the bank) into more pain?

> Nicole I hope you are in good spirits.  I know we all go through challenges in our lives and we can get dragged down by not healthy emotions, unfortunately.  We all have the same god and thankfully he always gives us a second chance.
>
> The Seven Laws of Noah include prohibitions against worshiping idols, cursing God, murder, adultery and sexual immorality, theft, eating flesh torn from a living animal, as well as the obligation to establish courts of justice.
>
> On every dollar bill it says The UNITED STATES OF AMERICA [space] IN GOD WE TRUST.
>
> I hope and pray god gives you the strength to choice the truth.  Wishing you and your family health wealth and happiness and inner Peace!

120.    A true and correct copy of the text received by Ms. Comer on February 4, 2021 that mentions Ms. Comer's children by name, false allegations concerning a PPP loan, false allegations of bankruptcy crimes, false allegations of sexual assault, and the Seven Laws of Noah, is attached as **Exhibit J**.

121.    Avraham Lehrer and/or Moshe Lehrer are the only two people in the world who could have sent the February 4, 2021 text that mentions Ms. Comer's children by name, false allegations concerning a PPP loan, false allegations of bankruptcy crimes, false allegations of sexual assault, and the Seven Laws of Noah.

### F.    Attempts to Get Avraham Lehrer and Moshe Lehrer to Stop Contacting Ms. Comer Have Failed.

122.    Ms. Comer has tried on multiple occasions to get Avraham Lehrer and Moshe Lehrer to stop contacting her.  All attempts have been expressly disregarded by Avraham Lehrer.

1. **Failed Attempt No. 1:  September 25, 2020**

123.    On September 25, 2020, after the initial barrage of harassing texts and false police report, CEI's corporate attorney contacted the Lehrers' attorney, Brian Condon, to advise him of his clients' behavior.  During the course of that conversation, CEI's corporate attorney demanded that Brian Condon tell his clients to stop contacting Ms. Comer.  In response, Brian Condon said not to worry about the threatening (scary) text messages and harassment because "they're not violent."

124.    Thereafter, neither Moshe Lehrer nor Avraham Lehrer stopped texting Ms. Comer, her family or certain of her friends.

2. **Failed Attempt No. 2:  October 6, 2020**

125.    On October 6, 2020, upon information and belief from direct communication with a Delaware State Police Trooper, a representative of the Delaware State Police contacted Brian Condon to inform Brian Condon that if Avraham Lehrer and Moshe Lehrer do not stop contacting Ms. Comer that they will be arrested.

126.    One hour later, Avraham Lehrer texted Ms. Comer and stated as follows:

> Dear Nicole and Mark,
> Interestingly enough, I just received a phone call from the Delaware Police Precinct.  Stating that you had filed a police report against me.  I'm assuming it's just another one of your minions.  As he refused to give me a call back number and only provided an email address…
> It's funny to me that you think that I'll loose any sleep over this.
> It's truly the least of my worries.
> On the other hand, though, I want you to think about a hypothetical instance where you found out that I, a 43 year old man had sexual relations with your 20yr old daughter, gave her drugs and drinks at bars….etc?
> How would you feel?
> I'd only imagine you'd think of nothing less than killing me yourself.
> Now, imagine how I feel, knowing you did all that to MY son.

> I honestly thought you were smarter than this Nicole.
> Seems to me that the deputy that called is also on your "special"
> payroll.
> Obviously I just wanted to wish you the upmost best!
> I always had faith in you!

127.     A true and correct copy of Avraham Lehrer's October 6, 2020 text to Ms. Comer is attached as **Exhibit K**.

128.      Since October 6, 2020, neither Avraham Lehrer nor Moshe Lehrer have stopped contacting Ms. Comer.

**3.     Failed Attempt Nos. 3 and 4:  October 14, 2020**

129.     On October 14, 2020, a representative of the Delaware State Police contacted Brian Condon to advise him that Avraham Lehrer should turn himself in.  In response, Brian Condon told the Delaware State Trooper who called him that he will take the information but was no longer involved.

130.     Also on October 14, 2020, CEI's corporate attorney called Brian Condon to inform Brian Condon that his clients had just made a series of death threats to a host of Ms. Comer's family, professional colleagues and a personal friend.  In response, Brian Condon said he is not involved anymore and told CEI's corporate attorney to not contact him again.

**G.     The Eastern District of Pennsylvania Action**

131.     In the midst of Avraham Lehrer's and Moshe Lehrer's campaign of terror against Ms. Comer, Moshe Lehrer sued Ms. Comer in the Eastern District of Pennsylvania (the "EDPA Action").  See Lehrer v. Comer, Case No. 2:20-cv-05228-GJP (E.D.Pa.), commenced October 20, 2020.  Moshe Lehrer claims in the EDPA Action that he and Ms. Comer entered into a common law partnership.  Moshe Lehrer asserts claims against Ms. Comer for (i) breach of partnership; (ii)

breach of fiduciary duty; and (iii) accounting, all stemming from CEI's, The Allere Group's, and Ms. Comer's termination of all relationships with Moshe Lehrer.

132.    This Action is separate from and independent of the EDPA Action.

**H.    Rosa Lehrer's and KMI's Malicious Prosecution and Slander of Title.**

133.    Also in the midst of Avraham Lehrer's campaign of terror, harassment and blackmail of Ms. Comer, Rosa Lehrer (Moshe's mother and Avraham's wife) used the entity KMI to maliciously prosecute two civil actions in separate Delaware courts against Ms. Comer. In connection with one such action, Rosa Lehrer caused KMI to slander title to Ms. Comer's personal residence by unlawfully recording a *lis pendens* against Ms. Comer's property in blatant derogation of the black-and-white language of Delaware's *lis pendens* statute.

**1.    The Superior Court Action and the Unlawful *Lis Pendens***

134.    On November 10, 2020, Rosa Lehrer (Moshe Lehrer's mother and Avraham Lehrer's wife) caused KMI to file a complaint in the Delaware Superior Court against Ms. Comer for alleged breach of a personal guaranty. See KMI Group, Inc. v. Nicole Bolt Comer, Civil Action No. N20C-11-086-JRJ (the "Superior Court Action").

135.    In reality, the Superior Court Action was nothing more than an attempt to harass Ms. Comer and to frustrate the imminent sale of her home – which was scheduled to close on December 10, 2020.

136.    In connection with the Superior Court Action, Rosa Lehrer caused KMI to record a *lis pendens* against Ms. Comer's personal residence, 12 Autumnwood Drive, Newark, Delaware (the "Lis Pendens").

137.    The Lis Pendens was the real reason for Rosa Lehrer causing KMI to commence the Superior Court Action – by recording the Lis Pendens, Rosa Lehrer hoped to be able to create

a cloud on title to Ms. Comer's real property that would not be cured before the scheduled December 10, 2020 closing.

138.    Rosa Lehrer then caused KMI's lawyers to contact the closing attorney and, at least, one of the real estate agents involved in Ms. Comer's closing and tell them that the Lis Pendens would never be cleared before the sale and that they should postpone the sale.

139.    On December 1, 2020, Ms. Comer filed an Emergency Motion for Mandatory Cancellation of Lis Pendens Pursuant to 25 Del. C. § 1606 (the "Motion to Cancel Lis Pendens"). A copy of the Motion to Cancel Lis Pendens is attached as **Exhibit L**. The Superior Court, Judge Jurden, scheduled a hearing on the Motion to Cancel Lis Pendens for December 3, 2020 (the "Emergency Hearing").

140.    After the attorneys that Rosa Lehrer hired for KMI reviewed the Motion to Cancel Lis Pendens, they waited until the "11th hour" before the Emergency Hearing to inform Ms. Comer's counsel that KMI would release and cancel the Lis Pendens.  KMI's late notice to Ms. Comer's counsel resulted in KMI not informing the Court until an hour before the Emergency Hearing that KMI would voluntarily release and cancel the Lis Pendens.

141.    On December 7, 2020, Rosa Lehrer caused KMI to voluntarily dismiss the Superior Court Action pursuant to Delaware Superior Court Rule 41(a)(1)(I).

142.    In the end, the Court found that there was no good faith basis in the first place to have recorded the Lis Pendens in such obvious violation of plainly stated Delaware statutory law. That finding, coupled with KMI's late notice to opposing counsel and the Court that it would cancel the Lis Pendens (thereby obviating the need for an emergency hearing for which Judge Jurden and her law clerk spent at least a full day preparing) caused the Court to issue a fee award

of $16,097 in favor of Ms. Comer for the fees and costs she incurred in connection with the Superior Court Action.

143.    A copy of the Superior Court (Judge Jurden) Order dated February 1, 2021 awarding Ms. Comer $16,097 in attorneys' fees and costs for KMI's unlawful recordation of the Lis Pendens is attached as **Exhibit M**.

144.    The fee award does not fully make Ms. Comer whole in connection with her defense against the Superior Court Action.

145.    The *only* reason Rosa Lehrer caused KMI to commence the Superior Court Action was to manufacture a basis to record the Lis Pendens.  In turn, the only reason for Rosa Lehrer to cause KMI's attorneys to record the Lis Pendens was to harass Ms. Comer and frustrate the sale of her personal residence – all of which was intended to gain leverage over Ms. Comer.

146.    Despite assertions by the attorneys Rosa Lehrer caused KMI to use for the Superior Court Action that they were going to refile the Superior Court Action in the Superior Court, to the best of Ms. Comer's and undersigned counsel's knowledge, information and belief, no such action has ever been filed (or refiled).

## 2.    **The Chancery Court Action.**

147.    On December 4, 2020 (prior to dismissing the Superior Court Action), Rosa Lehrer caused KMI to seek a second bite at the apple by commencing virtually the same action in the Delaware Chancery Court, albeit dressed with claims that KMI's attorneys apparently thought would win the day in Chancery Court.  See KMI Group, Inc. v. Nicole Bolt Comer, Civil Action No. 2020-1033-JRS (the "Chancery Court Action").

148.    Together with its complaint, verified by Rosa Lehrer, KMI filed a motion for a temporary restraining order to stop the sale of Ms. Comer's sale of her personal residence, then scheduled to close the following week, on December 10, 2020.

149.    The pleadings that Rosa Lehrer directed KMI's attorneys to file in the Chancery Court Action were filled with false statements concerning Ms. Comer's character and financial status, as well as specious legal arguments.

150.    After oral argument on December 9, 2020, the Chancery Court, Vice Chancellor Slights, summarily denied KMI's request for a TRO and expedited proceedings.  The transcript of Vice Chancellor Slights' oral opinion is attached as **Exhibit N**.

151.    On January 7, 2021, Rosa Lehrer caused KMI's attorneys to voluntarily dismiss the Chancery Court Action pursuant to Chancer Court Rule 41(a)(1)(i).

152.    The Chancery Court Action, like the Superior Court Action before it, was filed for the sole purpose of harassing Ms. Comer and frustrating Ms. Comer's home – in hopes of gaining leverage in the EDPA Action.  There was no good faith factual or legal basis whatsoever for the commencement and prosecution of the Chancery Court Action.  See Exhibit M.

## COUNT I:  PERMANENT INJUNCTION

## MS. COMER AGAINST MOSHE LEHRER AND AVRAHAM LEHRER

153.    Each of the foregoing allegations is incorporated as though fully set forth herein.

154.    Ms. Comer requires permanent injunctive relief to put a permanent stop to Moshe Lehrer's and Avraham Lehrer's campaign of terror, harassment and blackmail against her.

155.    Without the requested permanent injunction, Ms. Comer (and others) will continue to be terrorized by Defendants' unwanted and unlawful contacts with Ms. Comer, any

member of her family, CEI, The Allere Group and any employees, customers, clients, vendors or known prospective clients or customers of CEI or The Allere Group.

156.     No adequate remedy at law exists to rectify the harm that Ms. Comer will continue to suffer without the issuance of the requested permanent injunction.  Moreover, given the nature and recent escalation of threats and violence associated with Moshe Lehrer and Avraham Lehrer's campaign of terror against her and those associated with her, a permanent injunction is essential for Ms. Comer's and her family's safety

157.     A permanent injunction will cause absolutely no harm whatsoever to Moshe Lehrer and Avraham Lehrer.  All that is asked is that Moshe Lehrer and Avraham Lehrer stop contacting Ms. Comer and other individuals and entities that neither Moshe Lehrer nor Avraham Lehrer have any reason to contact.

158.     On the other hand, Ms. Comer, her family, friends and employees will continue to be terrorized and, thus, severely and irreparably harmed if the requested permanent injunction is not granted.

159.     The public interest favors issuance of the requested permanent injunction – namely to prevent emotional, mental and physical harm to citizens of the State of Delaware and to prevent the acts complained of herein from occurring in the State of Delaware.

<u>**COUNT II:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**</u>

<u>**MS. COMER AGAINST AVRAHAM LEHRER AND MOSHE LEHRER**</u>

160.     Each of the foregoing allegations is incorporated as though fully set forth herein.

161.     As set forth herein, Avraham Lehrer and Moshe Lehrer have terrorized Ms. Comer through a false police report, death threats, threatening voicemails to those in her orbit, and

continual texts to her and those in her orbit – including an unknown quantity of business contacts – regarding bogus allegations of sexual abuse.

162. Avraham Lehrer and Moshe Lehrer intentionally engaged in extreme or outrageous conduct that caused Ms. Comer severe emotional distress.

163. Avraham Lehrer and Moshe Lehrer's conduct described herein exceeds the bounds of decency and is intolerable in a civilized community.

164. Ms. Comer has suffered damages, including severe emotional distress as the result of Avraham Lehrer's and Moshe Lehrer's campaign of terror, harassment and blackmail.

**COUNT III:  INVASION OF PRIVACY (INTRUSION UPON SECLUSION)**

**MS. COMER AGAINST AVRAHAM LEHRER AND MOSHE LEHRER**

165. Each of the foregoing allegations is incorporated as though fully set forth herein.

166. Through their campaign of terror against Ms. Comer, Avraham Lehrer and Moshe Lehrer have intruded in Ms. Comer's solitude, seclusion, private affairs or concerns.

167. Avraham Lehrer's and Moshe Lehrer's intrusions into Ms. Comer's private affairs and physical environment would be highly offensive to a reasonable person.

168. Ms. Comer has suffered damages as the result of Avraham Lehrer's and Moshe Lehrer's intrusion upon Ms. Comer's seclusion.

**COUNT IV:  MALICIOUS PROSECUTION**

**MS. COMER AGAINST ROSA LEHRER AND KMI GROUP, INC.**

169. Each of the foregoing allegations is incorporated as though fully set forth herein.

170. Rosa Lehrer caused KMI Group, Inc. to institute and continue the Superior Court Action and the Chancery Court Action.

171.   KMI Group, Inc. (under Rosa Lehrer's management) voluntarily dismissed both the Superior Court Action and the Chancery Court Action after failing to frustrate Ms. Comer's sale of her real property.

172.   Rosa Lehrer maliciously caused the Superior Court Action and the Chancery Court Action to be instituted and continued.

173.   There was no probable cause for the institution and continuation of the Superior Court Action and the Chancery Court Action.

174.   As a result of Rosa Lehrer's malicious prosecution of the Superior Court Action and the Chancery Court Action, Ms. Comer has suffered damages.

## COUNT V:  SLANDER OF TITLE

## MS. COMER AGAINST  ROSA LEHRER AND KMI GROUP, INC.

175.   Each of the foregoing allegations is incorporated as though fully set forth herein.

176.   Rosa Lehrer caused KMI Group, Inc. to record the Lis Pendens against Ms. Comer's real property in the New Castle County office of the Recorder of Deeds.

177.   KMI Group's recordation of the Lis Pendens against Ms. Comer's real property was malicious.

178.   The Lis Pendens presented false information concerning the state of title to Ms. Comer's real property.

179.   As the result of Rosa Lehrer's actions in causing KMI Group, Inc. to maliciously and publicly record the Lis Pendens against Ms. Comer's real property, Ms. Comer has suffered special damages in the form of pecuniary loss.

WHEREFORE, Ms. Comer respectfully requests that the Court enter judgment in Ms. Comer's favor:

a)      permanently enjoining Moshe Lehrer and Avraham Lehrer from having any contact whatsoever with Ms. Comer, any member of her family, CEI, The Allere Group, or any employees of CEI or The Allere Group;

b)      awarding Ms. Comer damages arising out of or related to Avraham Lehrer's and Moshe Lehrer's intentional infliction of emotional distress and/or invasion of Ms. Comer's privacy;

c)      awarding Ms. Comer damages arising out of or related to Rosa Lehrer's and KMI's malicious prosecution of the Superior Court Action and the Chancery Court Action and their slander of title to Ms. Comer's former personal residence;

d)      awarding Ms. Comer injunctive relief;

e)      awarding Ms. Comer punitive damages;

f)      ordering Defendants to pay Ms. Comer's attorneys' fees and costs; and

g)      awarding Ms. Comer such other and further relief as is just and proper.

## **JURY DEMAND**

Ms. Comer demands a jury on all claims triable by jury.

Dated: March 4, 2021                        Respectfully submitted,

REED SMITH LLP

*/s/ Mark W. Eckard*
Brian M. Rostocki (No. 4599)
Mark W. Eckard (No. 4542)
Nicholas R. Rodriguez (No. 6196)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 778-7500
Facsimile:  (302) 778-7575
Email:  brostocki@reedsmith.com
Email:  meckard@reedsmith.com
Email:  nrodriguez@reedsmith.com

*Counsel to Nicole Bolt Comer*

# Exhibit A



# Broward County Sheriff's Office

20-10074 FG
## Booking Report



| CIS # | 572002793 | BCCN # | 934963 | | Booking Sheet Control Date and Time |
|---|---|---|---|---|---|
| OBTS | 609260332 | Print Clearance | 11/26/20 01:34:35 | Prints Yes | **11/26/20 02:50:37** |
| Arrest # | FL 2002793 | Offense Report # | 34-2011-180576 | Agency | FORT LAUDERDALE |

| Last Name First Middle | **LEHRER, MOSHE** | | | | | | | SSN # | | |
|---|---|---|---|---|---|---|---|---|---|---|

| Race | Sex | Height | Weight | Eyes | Hair | Comp. | Age Admitted | DOB | Place of Birth | State | FDLE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| W | M | 511 | 150 | BRO | BRO | LGT | 19 | 3/28/2001 | | NEW YORK | 0 |

| Permanent Address | 4020 GALT OCEAN DR 110 FORT LAUDERDALE FL 33308 | Months of Residence 24 |
|---|---|---|

| Arrest Date | 11/25/20 22:48:00 | Place of Arrest | 3500 GALT OCEAN DR FORT LAUDERDALE FL 33308 | Arresting Officer | 1375 COLLINS-KURAS |
|---|---|---|---|---|---|

| Inmate Logged Date | 11/26/20 00:14:26 | Inmate Log Type | FULL INTAKE | Place Admitted | MAIN |
|---|---|---|---|---|---|

Intake Comments  SP/CO/29/54-11107 WC-18703

Alias Last name, First, Middle, DOB

Warrants Officer Id: bs18783

Scars,Marks,Tattoos

| Release Date/Time | Release Reason | Release Authorized By |
|---|---|---|

| Charge No. 1 | Charge Initiation Date 11/26/20 02:27 | Statute 784.03-1a1 | Warrant/Capias | Level 1M | M.C Y | B. Type NO CHARGE | Bond Amount $0.00 |
|---|---|---|---|---|---|---|---|
| **Charges** | TOUCH OR STRIKE/BATTERY | | Comments | | | | |
| Booking Off. ID | bs13369 | County | | Judge | | | |

| Charge No. 2 | Charge Initiation Date 11/26/20 02:28 | Statute 806.13-1b3 | Warrant/Capias | Level 3F | M.C Y | B. Type BOND | Bond Amount $500.00 |
|---|---|---|---|---|---|---|---|
| **Charges** | CRIMINAL MISCHIEF OVER 1000 DOLLARS | | Comments | | | | |
| Booking Off. ID | bs13369 | County | | Judge | | | |

* End of Report *

29/54

☐ **COMPLAINT AFFIDAVIT**
SHADED FIELDS MUST BE ANSWERED IF DEFENDANT NOT IN CUSTODY          ☒ **ARREST FORM**

BROWARD COUNTY
ARREST # 20-02793                                                                                OBTS #

| Filing Agency FT LAUDERDALE PD | Offense Report 34-2011-180576 | Local ID # | FDLE | FBI | SS # |
|---|---|---|---|---|---|

| Defendant's Last Name LEHRER | First MOSHE | Middle | SUF | Alias/Street Name | | Citizenship US |
|---|---|---|---|---|---|---|

| Race W | Sex M | Hgt 5'11 | Wgt 150 | Hair BROW | Eyes | Comp LIGHT | Age 19 | DOB 03/28/2001 | Birth Place NEW YORK | |
|---|---|---|---|---|---|---|---|---|---|---|

Permanent Address | | | | | | | | | Scars, Marks, TT |
4020 GALT OCEAN DR 110, FORT LAUDERDALE, FL 33308

| Residence Type ☒ City (2) County (3) Florida (4) Out of State | Local Address 4020 GALT OCEAN DR 110, FORT LAUDERDALE, FL | Place of Employment , | Length |
|---|---|---|---|

| How long defendant in Broward County 21' | Breathalyser By/CCN | Reading | Place of Arrest 3500 BLK GALT OCEAN DR | Date/Time Arrested 11/25/2020  22:48 | Arresting Officer(s) CCN COLLINS-KURAS, KATHERINE E. |
|---|---|---|---|---|---|

| Officer Injured Y☐ N☒ | Unit PATR | Zone 3410 | Beat | Shift FL01 | Trans Unit 10282 | PMD Y☐ N☒ | Transporting Officer/CCN 1691 | Pick-up Time | Time Arrived/BSO |
|---|---|---|---|---|---|---|---|---|---|

| TYPE / ACTIVITY | Type N-N/A A-Amphetamine B-Barbiturate C-Cocaine | E-Heroin H-Hallucinogen M-Marijuana O-Opium/Deriv | P-Paraphernalia/ Equipment S-Synthetic U-Unknown Z-Other | Activity N-N/A P-Possess S-Sell B-Buy | T-Traffic A-Smuggle D-Deliver E-Use | M-Manufacture/ Produce/Cultivate K-Dispense/ Distribute Z-Other | Indication of | Y | N | UK |
|---|---|---|---|---|---|---|---|---|---|---|
| U / U | | | | | | | Alcohol Influence ☐ | ☐ | ☒ | |
| | | | | | | | Drug Influence ☐ | ☐ | ☒ | |

Attach Defendant's Photo

| Defendant's Vehicle Make: _____ Type: _____ Year: _____ Color: _____ VIN # _____ |
|---|
| Vehicle Towed To: _____                              Tag #: _____    Other identifiers or remarks: _____ |

| Name of victim(s) (if corporation, exact legal name and state of incorporation) DEMARCO, LOUIS | 3400 GALT OCEAN DR. FORT LAUDERDALE, FL 33308 | (917) 805-6365 |
|---|---|---|

| Count # | Offenses Charged | WC# / Citation # (if applicable) | FS or Capias/Warrant # |
|---|---|---|---|
| 1 | BATTERY-TOUCH OR STRIKE | | 784.03-1A1 |
| 1 | DAMAGE PROP-CRIM MISCH-1000 DOLS OR MORE | | 806.13-1B3 |
| | | | |
| | | | |

**Probable Cause Affidavit**

Before me this date personally appeared _COLLINS-KURAS, KATHERINE E. (1375)_ who being first duly sworn deposes and says that on
25 day of _November_ (year) _2020_ at _3400 GALT OCEAN DR. FORT LAUDERDALE, FL 33308_ (crime location)
the above named defendant committed the above offenses charged and the facts showing probable cause to believe the same are as follows:

The defendant, 19 YO LEHRER, and his father followed the 60 YO victim to his residential
parking lot with the belief that the victim was hired to stalk them.  LEHRER and his
father approached the victim and confronted him at which time the victim repeatedly said
that they had the "wrong guy".
The victim exited his vehicle and told them he just moved to town 2 weeks ago and has no
part in what they are alleging.  LEHRER and his father became very aggressive making
                                                                                    * * * Continued * * *

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated therein are true and correct to the best of my knowledge and belief

_COLLINS-KURAS, KATHERINE E. (1375)_                                                 _Patrol_
Officer/Affiant's Signature                    Officer's Name/CCN                     Officer's Division

STATE OF FLORIDA
COUNTY OF BROWARD

Sworn to (or affirmed) and subscribed before me this _25_ day of _November_, _2020_ (year),
by _OFFICER COLLINS-KURAS, KATHERINE E._ (name and title), who is personally known to me or has produced
_____ as identification.

Notary Public, Deputy Clerk of the Court, or Assistant State Attorney          _Ce 1691_          '20 NOV 26 AM 12:13
                                                                              Title/Rank and CCN

A- Dean
Print, Type or Stamp Commissioned Name of Notary Public                        (SEAL)

Seventeenth Judicial Circuit
Broward County
State of Florida                                    FIRST APPEARANCE/ARREST FORM

BSO DB-#2 (Revised 05/00)          (SHOULD ADDITIONAL SPACE BE NEEDED, USE THE PROBABLE CAUSE AFFIDAVIT CONTINUATION (BSO DB#2a))

Ong - Court
2nd - State Attorney
3rd - Filing Agency
4th - Arresting Agency

**COURT COPY**
SP|CO|29/54 -1110?          WC-18783

☐ **COMPLAINT AFFIDAVIT**
PROBABLE CAUSE AFFIDAVIT CONTINUATION

☒ ARREST FORM

BROWARD COUNTY
ARREST # **20-02793**

OBTS #

| Filing Agency **FT LAUDERDALE PD** | Offense Report **34-2011-180576** | Local ID # | FDLE | FBI | SS # |
|---|---|---|---|---|---|

| Defendant's Last Name **LEHRER** | First **MOSHE** | Middle | SUF | Alias/Street Name | Citizenship **US** |
|---|---|---|---|---|---|

Name of victim(s)  (if corporation, exact legal name and state of incorporation)

| Count # | Offenses Charged | WC# / Citation # (if applicable) | FS or Capias/Warrant # |
|---|---|---|---|
| | *** *SEE PAGE 1* *** | | |

**Probable Cause Affidavit**

Before me this date personally appeared ___COLLINS-KURAS. KATHERINE E.  (1375)___ who being first duly sworn deposes and says that on
___25___ day of ___November___ , (year) ___2020___ at ___3400 GALT OCEAN DR, FORT LAUDERDALE, FL 33308___ (crime location)
the above named defendant committed the above offenses charged and the facts showing probable cause to believe the same are as follows:

threats and scaring the victim while recording him on their cell phones.  When the
victim swatted a phone from out of his face, LEHRER sprayed the victim with
pepper-spray.  The victim raced back into his vehicle and tried to get away when
LEHRER`s father jumped on the hood of the victim`s vehicle in a "Hollywood-style" manner
to prevent him from leaving.  The victim drove away with the father on the hood, as
LEHRER rear-ended and side-swiped the victim`s vehicle with his own.  LEHRER eventually
cut off the victim and forced him to stop as officer`s arrived on scene.  Approximately
$8000 in damage was observed on the victim`s vehicle.  The victim wishes to prosecute
and stated that this crime was done against his will.

Surveillance video and cellphone video captured this event from multiple angles and
viewed by officers.  This incident was captured on BWC.

I swear the above statement is correct and true to the best of my knowledge and belief

_____  ___COLLINS-KURAS, KATHERINE E.  (1375)___  ___Patrol___
Officer/Affiant's Signature  Officer's Name/CCN  Officer's Division

STATE OF FLORIDA
COUNTY OF BROWARD
Sworn to (or affirmed) and subscribed before me this ___25___ day of ___November___ , ___2020___ (year),
by ___OFFICER COLLINS-KURAS, KATHERINE E.___ (name and title), who is personally known to me or has produced
_____ as identification

_____  ___1691___
Notary Public, Deputy Clerk of the Court, or Assistant State Attorney  Title/Rank and CCN

___A. Dean   1691___
Print, Type or Stamp Commissioned Name of Notary Public  (SEAL)

Seventeenth Judicial Circuit
Broward County
State of Florida

FIRST APPEARANCE/ARREST FORM

**COURT COPY**

BSO DB-#2a (Revised 05/00)

Orig - Court
2nd - State Attorney
3rd - Filing Agency
4th - Arresting Agency

# Exhibit B

**From:** max lehar
**Sent:** Wednesday, October 24, 2018 12:36 PM
**To:** Nicole Bolt Comer
**Subject:** Trying to reach you

Hey,
This is Max from Shield Funding. We see that you applied for some funding on our website and I have been trying to reach you.
If you can kindly call me back at your earliest convenience so that we can get you get you funded promptly.
Additionally, I am attaching our application. Please fill it out and send it back together with the last 4 months of your business banking statements to expedite the process.
If you have any questions, call me at any time.
Looking forward in working with you.


--
Max Lear


(347)977-6757
Shield Funding

Exhibit C



Delivered

Today 11:35 AM

Good morning Nicole,
I hope you are having a beautiful morning as I am myself.
I know that your broke, and most likely paying your lawyer with sex.
I'm just curious if he's still next to you...?
Maybe he can help you answer these questions:
How many years are you facing for underage soliciting?
How many years are you facing in federal prison for lying to the bankruptcy court?
How many years are you facing for laundering money, wire fraud, and tax evasion?
And how many years are you facing for  hiring a hit man to kill your husband Mark?

When he gives you these answers, I hope you'll be able to enjoy the rest of your day. Because you have absolutely no idea what you just did to yourself.

Wishing you a great rest of your day!
With much love,
Joe 🍷

Exhibit D



Thu, Sep 24, 11:35 AM

Good morning Nicole,
I hope you are having a beautiful morning as I am myself.
I know that your broke, and most likely paying your lawyer with sex.
I'm just curious if he's still next to you...?
Maybe he can help you answer these questions:
How many years are you facing for underage soliciting?
How many years are you facing in federal prison for lying to the bankruptcy court?
How many years are you facing for laundering money, wire fraud, and tax evasion?
And how many years are you facing for hiring a hit man to kill your husband Mark?

When he gives you these answers, I hope you'll be able to enjoy the rest of your day. Because you have absolutely no idea what you just did to yourself.

Wishing you a great rest of your day!
With much love,
Joe 🍷



**9:57**

‹ 44

JL

Joe ›

Tue, Sep 29, 11:50 AM

I really feel insulted that you think I would sit outside your house and waste my time. That not what I do for a living...... I am very professional and I have a book of guidelines. So enjoy your smile evey second.
Lots of love
Joe
PS: in Hebrew we say " you cook the tiger you eat the tiger" ✌️

Thursday 12:27 PM

Dear Nicole and Mark,
I've been in my field for a very long time and I truly cannot understand how you chose to make such an extensive decision without thinking it through on all levels, let alone on the simplest level which should've stopped you in your tracks.
To think that ANYONE, let alone a 19 year old boy, who invested a substantial amount into your company would just "walk away" and "forget that anything ever happened" because you "fired him" is just absurd.
To have not thought about the potential consequences and at this point to not be willing to speak or try and sort things out is definitely not smart on your end.

iMessage

9:57



44

Joe >

Nicole, you lied to a federal judge, opened a new corporation, switched over all your assets, AND got away with the MCA's.

It's really not that difficult to get in touch with some people who would be interested in all of this and to have it all reversed.

I don't even see how you'd be able to afford a top notch lawyer to fight the case, and trust me that would be needed.

Nicole, I think you climbed a very tall tree, one you won't be able to jump off of and land on your feet.

I can help you.

You've worked with me personally and you know that I never back down. I fight for what's right and what's needed by my client and get it done, period blank.

I fought for you, with you, and I am here to help.

There is absolutely no bias here from me (as of now). From my perspective I'm pretty sure both parties are on the same page and there's definitely a way to fix this.

I don't think either you or Max want this fight. I don't see ANY benefit on your end especially.

This does not need to go downhill. However, in the case you choose not to figure things out civilly, Max is my

iMessage

   

       



to figure things out civilly, Max is my client and I will do what it takes to get the job done to the fullest- as I did for you.

All it takes is a conversation, or a sit down, and I truly believe that this dispute can be settled the correct way without anyone facing any major repercussions.

I'm just looking at both ends here Nicole, and it's seem to be that you have a lot more to lose here than anyone else.

People make mistakes, but some mistakes can be undone.

Tomorrow at sunset is the Jewish holiday of Sukkot. That's my deadline. You have my contact info, and I sincerely advise that you reach out to me so that we can try and sort things out civilly.

By all means Nicole, regardless of your decision to pursue things peacefully or otherwise, I wish you all the best.

This does not need to have a bad ending.

Have Max's attorney reach out to my attorney, Brian advised Max's attorney my attorney's information

Delivered





9:58

**Joe** ›

Yesterday 10:05 AM

Good morning Nicole and Mark,
As previously noted, I was not planning on contacting you again. However, I recently received a message from one of our mutual friends stating, that you do not want my services anymore.
And so I just wanted to make something clear. Nicole, you never really hired me and so you definitely cannot fire me.
The same way one sees the blue sky above, I see you coming to me with a smile on your face to pay me my cut of 25% of overall savings for the work I've done.
Let me refresh your memory a bit Nicole...
Do you recall the weeks I spent at your house? outside your house? protecting you and your children?
Do you remember the fear you felt when Mark stood in your kitchen, shaking, with a gun in his hand?
You had full faith in me, as I would've done anything to protect you and your family and I think we both know that.
Forget Max, who I currently, for the time being, do NOT work for or with. I'm on my own, despite anything you might think.
And at the end of the day I provided

iMessage

       



9:58

‹ 44

JL

Joe ›

And at the end of the day I provided services for you in which I expect to be fully reimbursed for.
I have recordings of all our conversations and proof of all that was done.
Though, I'm not one who likes the Court system as to me the lawyers are the only ones that truly win.
I AM however a full force advocate for justice and will not give up easily.
I'm sure I'll get what I need here and so definitely don't put any pressure on yourself as it's unhealthy for the soul.
Just know that YOU never "fired me" and so I am not going anywhere.
I hope you have a wonderful day.

L'CHAIM! 🍷 TO LIFE! 🌹



Avi

Status:          Alive

Played by:       Steven Bauer

           

iMessage

       



9:58

‹ 44          JL
              Joe ›

**Avi Rudin** is Ray Donovan's right-hand man and the

That'd my lovely name! Avi

Yesterday 5:36 PM

Dear Nicole and Mark,
Interestingly enough, I just received a phone call from the Delaware Police Precinct. Stating that you had filed a police report against me. I'm assuming it's just another one of your minions. As he refused to give me a call back number and only provided an email address...
It's funny to me that you think that I'll loose any sleep over this.
It's truly the least of my worries.
On the other hand though, I want you to think about a hypothetical instance where you found out that I, a 43 year old man had sexual relations with your 20yr old daughter, gave her drugs and drinks at bars...etc?
How would you feel?
I'd only imagine you'd think of nothing less than killing me yourself.
Now, imagine how I feel, KNOWING you did all that to MY son.
I honestly thought you were smarter than this Nicole.
Seems to me that the deputy that called is also on your "special" payroll.

iMessage



# Exhibit E

Delaware.gov | Text Only
Governor | General Assembly | Courts | Elected Officials | State Agencies

Click and Hold to Drag Window around in screen

Close Window

**No Mugshot Available**

**CAUTION:** The warrants available in this database consist of warrants issued by the courts of Delaware. Recent changes in the status of the warrants may not be reflected in this online database. Do not attempt to make an arrest based on this warrant information. Only law enforcement officers can arrest a person for an outstanding warrant.

If you need to contact the police about anyone listed on this site please call their non-emergency numbers.
View Non-Emergency Police Phone Numbers

If you have information which may lead to the arrest of individuals named in these warrants, you may submit your tip online by clicking the crime stopper link above or by calling 800-847-3333.

E-mail this office - Send E-mail, call 866-751-5327 or mailing your information to Delaware Criminal Justice Information System, 802 Silver Lake Boulevard, Suite 101, Dover, Delaware 19904.



Help       Size       Print      Email

Click to Submit a Tip to Crime Stoppers

View Homeland Security Investigations Most Wanted

| Race | Sex |
|------|-----|
| White | Male |

**Full Name: LEHRER, AVRAHAM H**

| Last Name: | First Name: | Initial: |
|---|---|---|
| Lehrer | Avraham | H |

Other Names Used: 1

| Last Name | First Name | MI | Suffix | Sex | Race | DOB |
|-----------|-----------|----|--------|-----|------|-----|
| Lehrer | Avraham | H | | Male | White | 1974-08 |

| Birth Date: | Race: | Sex: |
|---|---|---|
| 1974-08 | White | Male |

Case History: 1

| Warrant Number | DUC Number | Court | Comments |
|---|---|---|---|
| 0620005390 | 2010006528 | Justice Of The Peace Court 11 | Michael Fiore / Harassment |

Exhibit F



.ıll AT&T  LTE          10:15 AM                86% ▬

‹                           +1 (619) 315-9508 ›

Good afternoon Mark,
From the very first time I met
you, I noticed the level your
intelligence and intellect. For
that alone, I hope you decide to
relay some smart advice to
Nicole.
You and I both know that there
is no way she getting away with
all of this. Especially
considering the $700K that
Max put down recently, plus
more.
There is plenty against her right
now from money laundering,
tax evasion, wire fraud,
underage sexual relations, and
the list goes on....
For children to see their own
mother being accused/indicted
on such charges can be
horrifying, embarrassing, and
detrimental.
There's a way to avoid this, I
just hope that you choose to
try and help her see that.

   iMessage

Exhibit G



HI

iMessage
Today 8:30 AM

Good morning
I know you have clear
instructions not to answer. But
in matter of the fact you're the
only one that can fix this. Trust
me and call me

You dont have to speak just
listen

I promise you 5min won't do
any harm

Don't call me later when it's too
late

This is a rookie mistake

Please send me your attorneys
info we believe you were apart
of this scam .......




iMessage

# Exhibit H



2:53      .ıl LTE 🔋

< 28     +1 (310) 400-6274 >

imagine we had access to bots in India Where there only job was to apply for the ppp loan as many times as possible just to assure the system that there fraud and they wouldn't approve that specific entity. I know this tactic work becuse we seen a movie 🎥 let's not make another movie lol please be smart and don't let your ego get out of proportion. It would suck to lose a free 1 million doller.

Today 2:52 PM



  
       

Text Message



# Exhibit I



Text Message
Today 9:23 PM

Find out what happened at 143 honey. Lucky day for your dad. I assure You Next time there will be no mistake on the address.
See you soon
MS13



# Exhibit J



53

+1 (619) 315-9508 ›

Today 8:03 PM

Hi Nicole

Hope all is well. It has been some time since we last connected .
As you are aware you are getting pretty close to an expiration date.
Just to remind you of all your business adventures you Nicole Comer are responsible for.
    1.   Regarding the loan you received from PPP its a full fledge fraud you know . The good news is that the government offered to the public 30% of the total loan to anyone reporting fraud.
    2.   In reference to the Silvercup, bankruptcy case  it will be reopened.
    3.   Regarding Santander and Mr. Hecht the proof of you

iMessage



AT&T 8:45 PM 87%

53

+1 (619) 315-9508

will be reopened.

3. Regarding Santander and Mr. Hecht the proof of you committing fraud is on the table.

4. Regarding all personal and sexual assault charges with Max will be handled by my lawyer.

5. In reference to your lawyer Joe I am happy that you are getting your desirable needs taken care of for your pleasure.

6. In reference to your bankruptcy lawyer Rob your personal needs are a huge game player but you so kindly manipulated him that you forgot to tell him the truth .He will have no choice but to go tell the judge the truth.

7.Regarding your two beautiful children may gd bless them with health wealth and happiness.

Your daughter Natalie who has

  iMessage

the judge the truth.

7.Regarding your two beautiful children may gd bless them with health wealth and happiness.

Your daughter Natalie who has unfortunately never met her biological dad and your son Max, two pure souls . Why would a devoted caring mom want to give her children more pain ?

Why would a daughter want to drag her special needs father (who got naked in the bank) into more pain?

Nicole I hope you are in good spirits . I know we all go through challenges in our lives and we can get dragged down by not healthy emotions ,unfortunately . We all have the same god and thankfully he always gives us a second chance .

iMessage



Nicole I hope you are in good spirits . I know we all go through challenges in our lives and we can get dragged down by not healthy
emotions ,unfortunately . We all have the same god and thankfully he always gives us a second chance .

The Seven Laws of Noah include
prohibitions against worshiping idols, cursing God, murder, adultery and sexual immorality, theft, eating flesh torn from a living animal, as well as the obligation to establish courts of justice.

On every dollar bill it says
The UNITED STATES OF AMERICA
        IN GOD WE TRUST

I hope and pray god gives you






53

+1 (619) 315-9508 ›

The Seven Laws of Noah
include
prohibitions against worshiping
idols, cursing God, murder,
adultery and sexual immorality,
theft, eating flesh torn from a
living animal, as well as the
obligation to establish courts of
justice.

On every dollar bill it says
The UNITED STATES OF
AMERICA
        IN GOD WE TRUST

I hope and pray god gives you
the strength to choice the
truth .
Wishing you and your family
health wealth happiness and
inner Peace !

The sender is not in your contact list.

**Report Junk**

iMessage

# Exhibit K

9:59

44   JL   Joe ›

Yesterday 5:36 PM

Dear Nicole and Mark,
Interestingly enough, I just received a phone call from the Delaware Police Precinct. Stating that you had filed a police report against me. I'm assuming it's just another one of your minions. As he refused to give me a call back number and only provided an email address...
It's funny to me that you think that I'll loose any sleep over this.
It's truly the least of my worries.
On the other hand though, I want you to think about a hypothetical instance where you found out that I, a 43 year old man had sexual relations with your 20yr old daughter, gave her drugs and drinks at bars...etc?
How would you feel?
I'd only imagine you'd think of nothing less than killing me yourself.
Now, imagine how I feel, KNOWING you did all that to MY son.
I honestly thought you were smarter than this Nicole.
Seems to me that the deputy that called is also on your "special" payroll.

Obviously, I just wanted to wish you the upmost best!
I always had faith in you!

iMessage

# Exhibit L

EFiled: Dec 01 2020 01:51PM EST
Transaction ID 66149332
Case No. N20C-11-086 JRJ

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KMI GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N20C-11-086 JRJ |
| | ) | |
| NICOLE BOLT COMER, | ) | |
| | ) | |
| Defendant. | ) | |

## EMERGENCY MOTION FOR MANDATORY CANCELLATION OF *LIS PENDENS* PURSUANT TO 25 *Del. C.* § 1606

Dated: December 1, 2020

REED SMITH LLP
Brian M. Rostocki (No. 4599)
Mark W. Eckard (No. 4542)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
Facsimile: (302) 778-7575

*Counsel for Defendant*

Defendant Nicole Bolt Comer files this Emergency Motion for Mandatory Cancellation of *Lis Pendens* Pursuant to 25 *Del. C.* § 1606.

## I.   PRELIMINARY STATEMENT

1.     This action has nothing to do with real property.  Plaintiff's complaint (the "Complaint") states one cause of action, seeking money damages.  To harass and frustrate Defendant's imminent closing on the sale of her home – ***scheduled for December 10, 2020*** – Plaintiff recorded a *lis pendens* (the "Lis Pendens") against Defendant's real property located at 12 Autumnwood Drive in Newark (the "Property").

2.     The Lis Pendens states that it was recorded because "*Defendant may own or have an interest in certain real property subject to judgment and execution*." A copy of the Lis Pendens is attached as Exhibit A.  The Complaint alleges, "upon information and belief," that Defendant is attempting to "fraudulently transfer assets" to frustrate Plaintiff's ability to collect on a judgment.  But there is no judgment and Plaintiff's fraudulent transfer theory is devoid of any factual support. Moreover, such an allegation does not allow a plaintiff seeking money damages to record a *lis pendens*.

3.     Under 25 *Del. C.* § 1606, the Lis Pendens must be canceled because (i) there is no claim relating to real estate in this Action and (ii) the claim that is pleaded, if sustained, would entitle Plaintiff solely to recover money damages.

## II.   **BACKGROUND**

4.     The Complaint alleges one claim for "Breach of Personal Guaranty" and concerns Plaintiff's allegation that Defendant breached her alleged personal guarantee related to a "Future Receivables Sale and Purchase Agreement" (the "Agreement").   In its prayer for relief, Plaintiff requests judgment:

> A.     Awarding KMI damages for Comer's breach of the Guaranty in an amount not less than $184,819.00;
>
> B.     Awarding KMI its costs and expenses, including reasonable attorneys' fees incurred in this action; and
>
> C.     Granting such other and further relief that this Court deems just and proper.

5.     The Complaint alleges, "upon information and belief" – without any factual support or reciting the elements for such a claim – that Defendant "has begun to engage in a scheme to fraudulently transfer assets out of her name in an effort to frustrate [Plaintiff's] ability to enforce the obligations owed under the Guaranty." *See* Compl. ¶ 26; *see also id.* ¶¶ 27-29.

6.     Defendant is scheduled to close on the sale of the Property on ***December 10, 2020***.  A copy of Defendant's contract of sale and a later-negotiated repair addendum are attached as Exhibit B.  Defendant has never met the Buyers. The purchase price for the Property is $735,000.00, which was negotiated at arms-length through real estate agents.

7.      Also on December 10, 2020, Defendant is scheduled to close on her purchase of a new home within the State of Delaware.  Defendant is happy to provide a copy of the contract for her purchase of her new home to the Court, *in camera*, without the principals of Plaintiff learning her new address and further unlawfully harassing her by attempting to do something to frustrate that sale.

8.      Prior to filing this Motion, Defendant (through counsel) contacted Plaintiff (through counsel) and requested that the Lis Pendens be canceled. Defendant provided Plaintiff information concerning Defendant's sale of the Property, including the contract for the sale.  Defendant asked for a response by the end of the day on Friday November 27, 2020 as to whether Plaintiff would remove the Lis Pendens.  The Lis Pendens has not been removed.

## III.   ARGUMENT

### A.    A Claim Must Touch Upon the Land to Record a *Lis Pendens*.

9.      25 *Del. C.* § 1601 states:

(a) In any action instituted in any court of this State having civil jurisdiction or in the United States District Court for the District of Delaware, any party asserting a claim, the object of which is to affect the title to, or enforce an equitable lien on, real estate may, after filing of such claim, file in the office of the recorder of deeds of any county in which all or any part of the affected real estate is situate a written notice of the pendency of the action . . .

(b) No notice of pendency shall be filed under this chapter:

    (1) On a claim relating to real estate which, if sustained, would entitle the party to recovery solely of money or money damages.

3

10.     25 *Del. C.* § 1601, *et seq.* (the "Lis Pendens Statute") was "intended to codify in clear terms the protections to be afforded to real property owners against unscrupulous plaintiffs, who might misuse the *lis pendens* doctrine and cause irreparable harm to legitimate titleholders." *See DiSabatino v. Salicete*, 695 A.2d 1118, 1120 (Del. 1997).  The Lis Pendens Statute provides that the Court "shall direct any recorder of deeds to cancel a [*lis pendens*] . . . if: . . . (3) The claim relating to the real estate is one which, if sustained, would entitle the party solely to recover money or money damages."  25 *Del. C.* § 1606.  Unlawful recordation of a *lis pendens* is not taken lightly.  "In an order either upholding a notice of pendency or canceling a notice of pendency, the court may, for good cause shown, and in the interest of justice, direct a party to pay the prevailing party's damages, if any, together with the court costs of the action."  25 *Del. C.* § 1611.

**B.     The Lis Pendens Must Be Canceled because this Action Has No Relation to the Property.**

11.     The Lis Pendens violates the first requirement of the Lis Pendens Statute:  that the "object" of the claim must be "to affect the title to, or enforce an equitable lien on, real estate."  25 *Del. C.* § 1601(a).  Here, Plaintiff seeks only money damages for an alleged breach of a personal guaranty that has no relation to the Property.  For this reason alone, the Lis Pendens must be canceled.

12.     The Lis Pendens violates the express prohibition on recordation of a *lis pendens* in connection with a "claim relating to real estate which, if sustained, would entitle the party to recovery solely of money or money damages."  25 *Del. C.* § 1601(b).  Here, the claim pleaded by Plaintiff is one that would, if victorious, entitle Plaintiff to recovery "solely of money."  *Id.*  Plaintiff's prayer for relief makes this point abundantly clear by solely seeking recovery of money.  *See* Compl. at p. 7 (asking the Court to award "damages for Comer's breach of the Guaranty in an amount not less than $184,819.00.").

### C.     Plaintiff's Basis for Recording the Lis Pendens is Meritless.

13.     Plaintiff's purported "upon information and belief" basis for recording the Lis Pendens is factually unsupportable.  Defendant's transaction of the sale of the Property (her private home) is not fraudulent.  Defendant has never met the buyers.  The transaction was negotiated through real estate agents.  The purchase price for the Property is well within the range of reasonable for the Property.

14.     The basis for recording the Lis Pendens, as stated on the face of the Lis Pendens, is unlawful.  *See* Lis Pendens ¶ 3 ("The Action additionally alleges that the Defendant may own or have an interest in certain real property subject to judgment and execution by reason of the Action.").  In addition to being a naked attempt at unconstitutional pre-judgment attachment, *see Connecticut v. Doehr*, 501 U.S. 1, 13-

14 (1991), Plaintiff does not even attempt to state any of the elements of a cause of action for fraudulent transfer.

**E.    Defendant Should be Awarded Her Damages, Attorneys' Fees and Costs in Connection with this Motion.**

15.    Pursuant to 25 *Del. C.* § 1611, Plaintiff must be directed to pay Defendant's damages, together with her attorneys' fees and costs, incurred in connection with this Motion.   At Defendant's instruction, undersigned counsel explained to Plaintiff's counsel the unlawfulness of the Lis Pendens and provided information necessary to assuage any concern that Defendant's sale of her Property is an attempted fraudulent transfer.   A central tenet of the Lis Pendens Statute is to protect defendants from unscrupulous litigants such as Plaintiff recording unlawful *lis pendens* for unscrupulous purposes.   *See DiSabatino*, 695 A.2d at 1120.   It would be unfair to not require Plaintiff to pay for the damages it caused by its unlawful basis for recording the Lis Pendens.

WHEREFORE, Defendant requests that the Court enter an Order: (i) directing the New Castle County Recorder, pursuant to 25 *Del. C.* § 1606, to cancel the Lis Pendens of record and mark the indices accordingly; (ii) directing Plaintiff, pursuant to 25 *Del. C.* § 1611 to pay damages suffered by Defendant resulting from the recordation of the Lis Pendens, including her attorneys' fees and costs incurred in connection with this Motion; and (iii) granting to Defendant such other and further relief as is just and proper.

Dated: December 1, 2020

Respectfully submitted,

REED SMITH LLP

*/s Mark W. Eckard*
Brian M. Rostocki (No. 4599)
Mark W. Eckard (No. 4542)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
Facsimile: (302) 778-7575

*Counsel for Defendant*

EFiled: Dec 01 2020 01:51PM EST
Transaction ID 66149332
Case No. N20C-11-086 JRJ

# Exhibit A

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

KMI GROUP INC.,                          )
                                          )
        Plaintiff,                        )
                                          )
v.                                        )        C.A. No. N20C-11-086 JRJ
                                          )
NICOLE BOLT COMER,                        )
                                          )
        Defendant.                        )

```
20201113-0102669
P: 1 of 2   F:$61.00
                         11/13/2020 2:39.15 PM
Michael E. Kozikowski          T20200052493
New Castle Recorder                     MISC
```

## NOTICE OF *LIS PENDENS*

Pursuant to 25 *Del. C.* § 1601, Notice is hereby given that:

1.     On November 10, 2020, an action was commenced in the Superior

Court of the State of Delaware (the "Action") by Plaintiff KMI Group Inc.

("Plaintiff") against Defendant Nicole Bolt Comer ("Defendant").

2.     The Action alleges Defendant's breach of a guaranty agreement that

Defendant executed as a guarantor on July 18, 2019.

3.     The Action additionally alleges that the Defendant may own or have

an interest in certain real property subject to judgment and execution by reason of

the Action, and that such property is located at 12 Autumnwood Dr. Newark,

Delaware 19711.

2

4.     Plaintiff therefore files this Notice of *Lis Pendens* upon the property

located at 12 Autumnwood Dr. Newark, Delaware 19711 and to be indexed and

directed against Defendant Nicole Bolt Comer.

Dated: 11/13/2020

**CHIPMAN BROWN CICERO & COLE, LLP**

Paul D. Brown (#3903)
Tayler D. Bolton (#6640)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
(302) 295-0191

*Attorneys for Plaintiff*
*Halevi Enterprises LLP*

**SWORN AND SUBSCRIBED** before me
this 13th day of November, 2020

NOTARY PUBLIC

My commission expires on 5-3-21

EFiled: Dec 01 2020 01:51PM EST
Transaction ID 66149332
Case No. N20C-11-086 JRJ

# Exhibit B




### AGREEMENT OF SALE for DELAWARE RESIDENTIAL PROPERTY

*This is a legally binding agreement; if not understood, seek competent legal advice prior to signing.*

THIS FORM IS DESIGNED AND INTENDED FOR THE SALE AND PURCHASE OF RESIDENTIAL
REAL ESTATE LOCATED IN THE STATE OF DELAWARE

**1. PARTIES.**

SELLER: **Dudley M Comer, Nicole Comer**

Address: **12 Autumnwood Dr,  Newark, DE  19711**

BUYER: **Brian Balzer, Tsai-Yuan Liu**

Address: **340 S Madison St, Wilmington, DE  19801-7100**

**2. PROPERTY.** Buyer hereby agrees to purchase from Seller and Seller agrees to convey to Buyer that Property identified as
TAX PARCEL # **0801700041**
being situated in
_____ County, Delaware and further identified as:

**12 Autumnwood Dr, Newark, DE  19711-2400**

**3. PAYMENT TERMS.**

    A. PURCHASE PRICE      $ **735,000.00**

    To be paid as follows:

    B. DEPOSIT UPON SIGNING THIS AGREEMENT    $ _____

    In the form of ☐ Check ☐ Cash ☐ Other _____

    C. DEPOSIT DUE WITHIN **3** DAYS OF ACCEPTANCE    $ **10,000.00**

    D. Additional DEPOSIT (if any) DUE WITHIN ____ DAYS OF ACCEPTANCE   $ _____

Any remaining balance will be paid at settlement. All sums deposited by Buyer prior to the time of final settlement shall be
placed in a *non-interest bearing* escrow account with Listing Broker ("Escrow Broker") unless otherwise specified in this
Agreement. Any funds delivered to the Escrow Broker within fifteen (15) days of settlement shall be certified funds. *Funds paid
by Buyer at settlement shall be in cash, certified check, cashiers check, treasurer's check, wire transfer or a Delaware attorney's
escrow check.* Seller's net proceeds shall be paid by check from the settling attorney's escrow account unless other
arrangements are made with the attorney.

**4. INCLUSIONS/EXCLUSIONS.** Unless specifically excluded by this Agreement the purchase price shall also include the
following, as and if now installed, stored in, or located on the Property: all presently existing plumbing, heating, electrical and
central air conditioning systems; and all other permanent or attached fixtures including but not limited to, all existing shutters,
awnings, wall to wall carpeting, radiator covers, cabinets, shelves, mirrors fixed in place, attic/exhaust fans, lighting and
plumbing fixtures, and landscaping. Certain other now existing items which may be considered personal property, whether
installed or stored upon the Property are included, as follows: **(If neither column is checked, item shall be considered
excluded. *Should the Sellers Disclosure of Real Property Condition Report differ from the below list of included
items, the below list shall supersede)*:**

| YES | NO | | YES | NO | | YES | NO | |
|-----|----|--|-----|----|--|-----|----|--|
| X | | Range with oven | | | Draperies/Curtains | | X | Wall Mounted Flat Screen TV # ____ |
| | | Range Hood-Exhaust Fan | | | Drapery/Curtain Rods | | X | Wall Brackets for TV # ____ |
| | | Cooktop-stand alone | X | | Shades/Blinds | | X | Surround Sound System & Controls |
| X | | Wall Oven(s) # ____ | | | Cornices/Valances | | | Attached Antenna/Rotor |
| X | | Kitchen Refrigerator | | | Furnace Humidifier | | X | Garage Opener(s) # ____ |
| X | |   with Icemaker | X | | Smoke Detectors | | X |   with Remote(s) # ____ |
| | | Refrigerator(s)-additional # ____ | X | | Carbon Monoxide Detectors | | X | Pool Equipment |
| | | Freezer-free standing | | | Wood Stove | | X | Pool Cover |
| | | Ice Maker-free standing | X | | Fireplace Equipment | | | Hot Tub, Equipment |
| X | | Dishwasher | X | | Fireplace Screen/Doors | | |   with Cover |
| X | | Disposal | | | Electronic Air Filter | | | Sheds/Outbuildings # ____ |
| X | | Microwave | | | Window A/C Units # ____ | | | Playground Equipment |
| X | | Washer | | | Attic Fan | | | Irrigation System |
| X | | Dryer | | | Whole house fan | | | Water Conditioner (owned) |
| | | Trash Compactor | X | | Bathroom Vents/Fans | | | Water Conditioner (leased) |
| | | Water Filter | | | Window Fan(s) # ____ | | | Fuel Storage Tank(s) (owned) |
| X | | Water Heater | X | | Ceiling Fan(s) # ____ | | | Fuel Storage Tank(s) (leased) |
| X | | Sump Pump | | | Central Vacuum | | | Security/Monitoring Systems (owned) |
| | | Storm Doors | | |   with Attachments | | X | Security/Monitoring Systems (leased) |
| X | | Screens (where present) | | | Intercoms | | | Solar Equipment (owned) |
| | | | | | Satellite Dish | | | Solar Equipment (leased) |
| | | | | |   with Controls & Remote(s) | | | |

ADDITIONAL INCLUSIONS (Not previously checked)
(Specify): **Wine refrigerator, plantation shutters**

Seller's Initials _____ Buyer's Initials _____

©Copyright 2009-2019 by Delaware Association of REALTORS®. All Rights Reserved. Revised March 11, 2019. This form has been created exclusively for ... embers
and those with written permission. The use of this form for any transaction that does not involve the participation of an association member is strictly prohibited and is in violation of Federal
Copyright laws.

ADDITIONAL EXCLUSIONS (Not previously checked)
(Specify): _____
_____
_____

All property sold by this Agreement is called the "Property". No items shall be replaced or substituted without prior written approval of all parties.

**5.** **RENTAL/ LEASE.**
(a)    The Property ☐ is ☒ is not subject to any tenant rental/lease agreements. Seller will not alter any existing agreement nor enter into any new rental/lease agreement without Buyer's written consent and will assign all existing leases and transfer security deposits, and any other pre-paid items to Buyer at final settlement. Buyer agrees to cooperate with Seller's Rental Agency by signing the necessary documents **prior to completion of settlement** to facilitate the existing rentals after final settlement.
(b)    The Property ☐ is ☒ is not subject to any third party rental/lease agreements including but not limited to oil or gas tank leases, solar panel leases and/or security monitoring system lease agreements. Seller will not alter any existing agreement nor enter into any new rental/lease agreement without Buyer's written consent. Buyer and Seller agree to mutually cooperate with the transfer of any rental/lease agreements prior to final settlement.

**6.** ☒ Yes ☐ No **FINANCING CONTINGENCY.**
(a)    Buyer's obligation to purchase the Property shall be contingent on Buyer's ability to obtain mortgage financing pursuant to the terms set forth below. Each of the terms below as applicable shall be deemed essential to this financing contingency and Buyer shall not make application for any mortgage financing the terms of which would differ or deviate from the requirements set forth below that would be adverse to Seller's interest without Seller's express prior written consent. The Interest rate shall be at the prevailing rate. Should, after Buyer makes application consistent with the terms set forth below, and has diligently and in good faith pursued that application, any commitment for mortgage financing that may be issued deviate from one or more of such terms, and Buyer elects not to accept the financing thus offered, or the application is denied, Buyer may, at Buyer's sole election, void this Agreement, in which event all deposits shall be returned to Buyer. The terms of mortgage financing are the following:

| Type of financing: | **Conventional** | Loan Amount: | **435,000.00** |
|---|---|---|---|
| Term in years: | **30** | Maximum loan to value ratio: | **59%** |

Final date for receipt of Buyer's mortgage commitment, and the appraisal, if required by lender (the "Commitment Date"):
**November 30, 2020**

(b)    Buyer will make written application in a manner consistent with that provided for above within _____ days of the effective date of this Agreement, and shall use their best efforts and diligently pursue such financing and promptly file any supplemental information, papers and/or other material that may be requested or required from time to time by the lender. If Buyer fails to make application as specified above, then Seller may declare Buyer in default of this Agreement by tendering written notice of that election to Buyer at any time prior to Buyer making application consistent with the terms set forth above. Should Seller elect to declare Buyer in default before such application is completed, Seller shall have available all the remedies set forth in this Agreement.

(c)    Buyer shall provide Seller, or Seller's Designated Agent, with a copy of any mortgage commitment on or before the commitment date above. If a commitment consistent with the terms set forth above, or one that differs from those terms which is nonetheless acceptable to Buyer is obtained and said commitment (1) imposes financial obligations upon the Seller which the Seller has not previously agreed to pay, and does not then agree to pay, and/or (2) is contingent upon the sale of any real or personal property owned by Buyer, then Seller may within (5) days after receipt of a copy of the commitment, cancel this Agreement in writing, and all deposit money shall then be returned to Buyer in accordance with provisions of this Agreement. If such notice is not given, Seller shall be deemed to have accepted said condition(s).

(d)    If a written mortgage commitment is not delivered to Seller by the Commitment Date, Seller shall from that time forward have the right to void this Agreement by tendering written notice of that election to Buyer or Buyer's Designated Agent provided, however, that if written mortgage commitment is delivered to Seller after the Commitment Date and prior to any such written notice of termination, then this Agreement shall remain in full force and effect, and Seller's right to void this Agreement for failure to meet the Commitment Date shall be deemed waived. If Seller elects to terminate as set forth in this paragraph, and Buyer is not then otherwise in default of the terms of this Agreement, all deposit money shall be returned to Buyer in accordance with the terms of this Agreement. If Buyer at that time claims that the mortgage application resulted in a denial of that application, Buyer shall provide Seller with a copy of the denial.

(e)    No representation is made by the agents or parties as to whether or not the Property will qualify for the type of financing indicated.

(f)    Buyer authorizes the mortgage lender and settlement attorney to share with the real estate agents and Seller the following documents in connection with their application for a mortgage loan: (a) any preapproval, (b) any pre-Loan Estimate of loan costs, (c) the Loan Estimate (and any revisions), (_~~~~~~~~~~~~~~ement, and (e) Closing Disclosure (and any revisions). Buyer authorizes settlement attorney to share th(_____~~~~~~~~~nt (if any) with the Se~~~~~

Seller's Initials _____        Buyer's Initials _____

©Copyright 2009-2019 by Delaware Association of REALTORS®. All Rights Reserved. Revised March 1, 2019. This form has been created exclusively for the use of the association members and those with written permission. The use of this form for any transaction that does not involve the participation of an association member is strictly prohibited and is in violation of Federal Copyright laws.

agents. If asked, Buyer shall provide the above mentioned documents directly to the real estate agents and settlement attorney if the lender does not provide them. This authorization shall expire upon written denial of the loan application.

**7.      SETTLEMENT.** Unless otherwise mutually agreed, final settlement shall be held in _____**New Castle**_____ County, Delaware on _____**December 10, 2020**_____, or before if mutually agreed upon, at which time possession shall be given and Seller shall deliver all keys in Seller's possession or under Seller's control. It is expressly agreed if a longer time is necessary to secure a survey, or to prepare the necessary legal and financial settlement documents, the date of settlement shall be extended for a reasonable time to effect these conditions.

Seller authorizes settlement attorney to share with the buyer and real estate agents the following documents: (a) Closing Disclosure (and any revisions), and (b) Settlement Statement (if any). If asked, Seller shall provide these documents to the Buyer and real estate agents if the settlement attorney does not provide them.

The parties agree to attend settlement together in the same conference room unless arrangements are made before settlement with the settlement attorney.

The parties understand that the mortgage lender must provide Buyer with the Closing Disclosure at least three specific business days prior to Consummation (settlement). If the Closing Disclosure is mailed, it must be confirmed to have been mailed out a minimum of seven specific business days prior to Consummation (settlement). Specific business days are defined as all days except Sundays and federal holidays. Therefore, all parties understand the importance of providing information and dollar figures to the lender in a timely fashion. Agents are not responsible for delays in settlement caused by failure of the parties to provide information in a timely fashion.

**WIRE FRAUD ALERT.** Never trust wiring instructions sent by email. Criminals are hacking email accounts of real estate agents, Buyers, Sellers, settlement attorneys and others, resulting in fraudulent wire instructions being used to divert funds to the account of the criminal. The money is then gone. The emails often look legitimate, but they are not. Buyer and Seller are advised not to wire any funds without personally speaking with the intended recipient of the wire to confirm the routing number and the account number. Use only verified trusted contact information to double check that the wiring instructions are correct. Buyer and Seller should not send personal information such as social security numbers, bank account numbers and credit card numbers except through secured fax, encrypted email, a trusted carrier, or personal delivery to the intended recipient.

**8.      TIME IS OF THE ESSENCE.** Other than those limited conditions related to settlement as noted in Paragraph 7 above, time is of the essence in this Agreement. Time is of the essence means that the dates and time frames agreed by the parties must be met. Failure to meet stated dates or time frames may result in waiver of contractual rights or default under the terms of this Agreement.

**9.      CONVEYANCE.** The Seller acknowledges that the Property is to be conveyed (check one):
- [X] **IN FEE SIMPLE**
- [ ] **CO-OP OWNERSHIP**
- [ ] **LEASEHOLD SUBJECT TO AN ANNUAL GROUND RENT**, presently in the amount of $ _____

**10.     DISBURSEMENT OF DEPOSITS.** The parties to this Agreement agree that deposit monies held on account as specified herein shall only be disbursed under one of the following conditions:
- A.   Upon final settlement hereunder; OR
- B.   Upon a release being signed by all parties to the transaction authorizing disposition of these funds; OR
- C.   Upon the filing of an interpleader action in the proper court, thereby causing these funds to be deposited with the court; OR
- D.   At such time as one of the parties to the transaction files suit and the court orders the disbursement of these funds.

Buyer and Seller agree that upon payment of deposit monies into court, neither Buyer nor Seller shall have any further right, claim, demand or action against Escrow Broker regarding the return or disposition of the deposit monies, and Buyer and Seller, jointly and severally, shall indemnify and hold Broker harmless from any and all such rights, claims, demands or actions. In the event of a dispute, and after no less than fifteen (15) days advance notice delivered by certified mail to the Buyer and Seller at their addresses identified in this Agreement of Sale, should Broker elect to file an action of interpleader as herein provided, Buyer and Seller further agree and hereby expressly and irrevocably authorize Broker to deduct from the Deposit all costs incurred by Broker in the filing and maintenance of such action of interpleader including but not limited to filing fees, court costs, service of process fees and attorneys' fees, provided that the amount deducted shall not exceed the lesser of five hundred dollars ($500.00) or the amount of the Deposit held by Broker. All such fees and costs authorized herein to be deducted may be deducted by Broker from the Deposit prior to paying the balance of the Deposit to the court. Buyer and Seller further agree and expressly declare that all such fees and costs so deducted shall be the exclusive property of Broker. If the amount deducted by Broker is less than the total of all of the costs incurred by Broker in filing and maintaining the interpleader action, then Buyer and Seller jointly, and severally, agree to reimburse Broker for all such excess costs upon the conclusion of the interpleader action.

**11.     TRANSFER TAXES; PRO-RATIONS; HEATING FUEL.** Applicable transfer taxes and/or motor vehicle document fees shall be paid one-half by Buyer and one-half by Seller, except that, should either party be specifically exempted from any portion of any applicable authority's transfer tax, that exempted party shall receive the full exemption for which they are entitled, with such exemption having no effect on any remaining transfer taxes due. Should the transaction, as opposed to a party, be exempted from any applicable transfer tax, then both parties s_____ _____ _____ from such exemption. Any fees assessed to a specific party shall be paid by that party and not prorated.

Seller's Initials _____        Buyer's Initials _____

©Copyright 2009-2019 by Delaware Association of REALTORS®. All Rights Reserved. Revised March 7, 2019. This form has been created exclusively for the use of the association members and those with written permission. The use of this form for any transaction that does not involve the participation of an association member is strictly prohibited and is in violation of Federal Copyright laws.

Taxes, special assessments, ground rent, water, sewer, electric and other lienable charges imposed by the State of Delaware, any political subdivision thereof, any school district, neighborhood association and/or condominium common expenses shall be apportioned pro-rata at the time of final settlement, as shall the rents and pre-paid operating expenses if Property is sold subject to a lease. Buyer shall pay Seller at settlement current market price for any remaining heating fuel conveyed with Property. Buyer is advised that in some cases propane tanks located on residential properties are leased and ownership of the tank may not be transferred to Buyer as part of this agreement.

☐ Seller ☒ Buyer shall pay for deed preparation. Buyer shall pay all other customary settlement charges and lending costs including survey.

**12.     TITLE.** Title is to be good and marketable either fee simple absolute conveyed by Deed of Special Warranty or Lease-hold Estate conveyed by assignment of the existing lease, as applicable, insurable for both owners and lenders coverage at regular rates by a title insurer duly licensed to issue title insurance in the State of Delaware, clear of any liens and encumbrances, except restrictions of record and existing easements generally applicable to properties in the immediate neighborhood or the subdivision in which the Property is located. Title shall also be delivered without encroachments or violations of restrictions, zoning or subdivision regulations unless disclosed by Seller on the Seller's Disclosure of Real Property Condition Report. If title objections are raised, Seller shall have thirty (30) days from the date Seller is notified to cure the same, and the settlement date shall be extended accordingly. If objections are not satisfied by the extended settlement date, this Agreement shall terminate and all deposit monies shall be refunded to Buyer and all reasonable legal, loan, survey, and inspection fees incurred by Buyer will be paid by Seller, unless Buyer elects to waive the unsatisfied objections and complete the purchase. Seller may use the purchase price payable to Seller at settlement to discharge liens and encumbrances of record in fixed and ascertainable amounts.

**13.     NOTICE/DELIVERY OF DOCUMENTS.** In this paragraph, the word "Agreement" includes offers, counteroffers, addenda or any other notice or agreement between the parties. All agreements shall be in writing. Verbal, electronic or written communication between the parties or the parties' Designated Agent(s) that this Agreement has been signed and ratified shall be binding on all parties and such notice shall constitute delivery. Written communication shall be effective when sent. A facsimile, electronic record with electronic signature or photocopy of a signed Agreement shall constitute an original. Buyer or Seller, if there be more than one, expressly agree that notice to one shall be notice to all.

**14.     NO RECORDING.** This Agreement shall not be recorded or filed in any place of public record. If Buyer does record this Agreement, or permit this Agreement to be recorded, Seller may elect to treat such act as a default and have all the remedies provided herein.

**15.     FAIR HOUSING.** All Parties agree to comply with all Fair Housing and Civil Rights laws in the purchase and sale of the Property and further agree specifically not to discriminate against any person because of RACE, COLOR, NATIONAL ORIGIN, RELIGION, CREED, SEX, MARITAL STATUS, FAMILIAL STATUS, AGE, SEXUAL ORIENTATION, GENDER IDENTITY, SOURCE OF INCOME and/or HANDICAP/DISABILITY.

**16.     FIRPTA AND DELAWARE TAX PAYMENT.** Section 1445 of the United States Internal Revenue Code of 1986 provides that a Buyer of residential real property located in the United States must withhold federal income taxes from the payment of the purchase price if; (a) the purchase price exceeds three hundred thousand dollars ($300,000.00); and (b) the Seller is a foreign person. Unless otherwise stated in an addendum attached hereto, if the purchase price is in excess of three hundred thousand dollars ($300,000.00), Seller represents that Seller is not a nonresident alien, foreign corporation, foreign partnership, foreign trust or foreign estate (as those are defined by the Internal Revenue Code and applicable regulations) and agrees to execute an affidavit to this effect at time of settlement. By Delaware law, money may be withheld from a Seller who will not be a resident of Delaware after Settlement, unless exempt. Delaware tax form 5403 is used to calculate the amount of tax required to be withheld from Seller at settlement.

**17.     HOMEOWNERS WARRANTY.** Buyer and Seller are advised that Homeowners Warranties are available. A Homeowners Warranty is only part of this Agreement if Buyer or Seller agrees to purchase a warranty. Buyer and Seller are advised to request information about what is included in the warranty and what is excluded (for example, preexisting conditions) and the amount of the deductible.

**18.     RISK OF LOSS.** The risk of loss or damage to the Property by fire, wind storm or other casualty until settlement shall be borne by Seller. If any part of the property is damaged or destroyed by fire or other casualty loss, Seller shall restore the same to its previous condition as soon as reasonably possible, but in any event by settlement date. If Seller is unable to do so, Buyer may terminate this Agreement and the deposit monies shall be refunded to Buyer in accordance with the terms of this Agreement.

**19.     CONDITION OF PROPERTY; INSPECTIONS.** Seller shall deliver the Property in substantially the same physical condition as of the date of this Agreement unless repairs are agreed to as part of the inspection processes explained in paragraphs 20, 21 and 22. However, the electrical, plumbing, heating, air conditioning, and any other electro-mechanical systems, appliances and equipment included in this Agreement shall be in operating condition at time of final settlement unless otherwise disclosed in the Seller's Disclosure of Real Property Condition Report Form or elsewhere in this Agreement of Sale. Seller's responsibility for these items shall expire at the time of settlement.

Seller shall not be obligated to repair any defects fully disclosed in the Seller's Disclosure of Real Property Condition Report or defects otherwise accepted by Buyer in this Agreement or as a result of the inspections. However, specific actions required by this Agreement or agreed to by addendum resulting from the inspections, such as "repair defective electric outlet in the kitchen," will remain part of this Agreement.

Seller's Initials [ NBC ]        Buyer's Initials [ ___ ___ ]

©Copyright 2009-2019 by Delaware Association of REALTORS®. All Rights Reserved. Revised March 7, 2019. This form has been created exclusively for the use of the association members and those with written permission. The use of this form for any transaction that does not involve the participation of an association member is strictly prohibited and is in violation of Federal Copyright laws.

DocuSign Envelope ID: 8D44CCC1-0259-4249-BED2-184556171385

5

Any failures of the Property occurring between the time of final acceptance and settlement shall be repaired by Seller, at Seller's expense, prior to settlement. Seller is responsible for insuring that utilities are turned on during inspections, appraisals and pre-settlement inspection. Seller agrees to permit access to Property by any authorized appraiser, inspector or contractor as required by the lender or by other terms of this Agreement. Property shall be "broom clean" and free of debris at time of final settlement or occupancy (whichever occurs first).

Buyer shall have the responsibility of scheduling a pre-settlement inspection of Property within 48 hours prior to settlement to verify that Property is in the condition required by this Agreement including conditions disclosed and accepted by Buyer elsewhere in this Agreement or by addendum.

Except as expressly contained herein, no other warranties or representations have been made by Seller or relied upon by the Buyer, and upon settlement all the Seller's obligations for condition of the Property under this Agreement shall expire. It is understood and agreed by the parties hereto the Broker(s)/Salesperson(s) assumes no responsibility for defects concerning the physical condition of the Property described herein and all improvements thereon. Buyer represents that they have made a satisfactory inspection of the Property and agrees to accept the Property in its present condition except as otherwise provided in this Agreement.

**20.** [X] Yes ☐ No **WOOD DESTROYING INSECT INSPECTION REPORT.**
Buyer shall procure, at Buyer's expense (unless prohibited by the type of mortgage financing, in which case it shall be procured by the Buyer at Seller's expense), a wood destroying insect inspection report (WDI) from a company holding a Pesticide Business License or an individual licensed by the Department of Agriculture as a Commercial Pesticide Applicator (Restricted Use) Category 7B Wood Destroying Pest Control (WDI Inspector).
The inspection shall include the house, attached or detached garage, and improvements attached to the house or garage, but not other detached items on the Property, such as (but not limited to) sheds, fences, wood piles, mulch beds, etc., unless such items are specifically listed herein.
The Buyer shall deliver to Seller a copy of the WDI report no later than _____**November 16, 2020**_____ (date).

   (a) If there is no active infestation, prior infestation, prior treatment or damage from infestation, then no further action is needed by either party.

   (b) If the report indicates that there is any active infestation, prior infestation, prior treatment or damage from infestation, then Buyer may obtain an inspection to determine if the structural integrity of the property has been impaired and provide an estimate for treatment and repairs. The party who pays for the pest inspection shall pay for the structural inspection ("the first structural report") and estimate. If the first structural report states that the structural integrity has not been impaired, no repairs by the Seller shall be required.

   (c) If the cost to treat and repair damage exceeds 10% of the Purchase Price, Buyer may declare this Agreement null and void, in which case the deposit shall be returned to the Buyer in accordance with provisions in this Agreement, and each party shall be relieved of further liability to the other.

   (d) If (c) does not apply, then Seller shall have the option of treating the infestation and having any structural impairment corrected by licensed contractors, at Seller's expense prior to settlement. Seller shall, within five (5) days, notify buyer in writing whether or not Seller will exercise its option to do any required work. If Seller elects to do any required work, Seller shall deliver to Buyer a written report prepared by a WDI Inspector/Licensed contractor itemizing the treatment/repairs to be made. After the treatment/repairs have been completed, Seller shall provide Buyer with a written statement from the licensed contractor certifying that the repairs required by the first structural report have been completed and the integrity of those areas is no longer structurally impaired. This report shall be provided by settlement. Buyer may, at Buyer's expense, hire a representative to be at the Property while the Seller's contractor makes repairs. If Seller elects not to correct or fails to provide written notice within five (5) days, Buyer shall have the option of proceeding to settlement without reduction of the purchase price or declaring this agreement null and void in writing and being repaid all deposit money. Written notice of Buyer's election to declare this agreement null and void must be delivered to Seller within five (5) days after receiving Seller's written notice or Seller's failure to give written notice.

   (e) If Buyer does not declare this agreement null and void, there shall be no liability of Seller for the infestation or damage, no obligation of Seller to correct, no reduction of the purchase price, no credit to Buyer at settlement for the cost of correction or re-inspection and Buyer shall be responsible for any correction or re-inspection required by Buyer's lender. If this paragraph applies, Buyer purchases the Property in "as is" condition and waives all claims under this paragraph against the Seller, the Broker(s) and Salesperson(s), for any damage to the structure by wood destroying insects.

**21.** [X] Yes ☐ No **HOME INSPECTION CONTINGENCY.** (If neither is checked, this contingency is waived).
Written report of major defects and request(s) for repairs, if any, due to Seller by _____**November 16, 2020**_____ (or within fifteen (15) days of ratification/effective date of this Agreement if no date specified).

Written response from Seller due to Buyer by _____**November 18, 2020**_____ (or within seven (7) days of Seller's receipt of Buyer's written request if no date specified).

Written negotiations (if any) to be completed by _____**November 20, 2020**_____ (or if no date is specified, within three (3) days of Buyer's receipt of Seller's response, or in the absence of Seller's written response, within ten (10) days of Buyer's written request for repairs).

Other systems or items to be inspected by the home inspector _____ **As deemed by** _____
Seller's Initials _____ Buyer's Initials _____

©Copyright 2009-2019 by Delaware Association of REALTORS®. All Rights Reserved. Revised March 7, 2019. This form has been created exclusively for the use of the association members and those with written permission. The use of this form for any transaction that does not involve the participation of an association member is strictly prohibited and is in violation of Federal Copyright laws.

6

If buyer is not purchasing a newly constructed home, the Property may have minor problems associated with a previously owned property. Unless otherwise noted in Paragraph 32, Buyer assumes the risk of the condition of items that cannot be adequately inspected due to weather or other conditions not under Seller's control. A major defect is any deficiency or condition that causes an item to perform in an unsafe manner or that prevents the item from performing its intended function. The inspection shall be limited to the house, attached or detached garage(s), improvements attached to the house or garage(s); and the electrical, plumbing, heating, air conditioning, and any other electro-mechanical systems, appliances and equipment included in this sale.

If "Yes" is indicated above, this Agreement is contingent upon Buyer obtaining a home inspection of the Property and written report (the Inspection), by a home inspection company and/or particular component(s) by a licensed contractor/professional of Buyer's choice at Buyer's expense. If Buyer does not choose to obtain an Inspection, or if major defects are not reported to the Seller by date specified, then Buyer has waived the Home Inspection contingency.

If the home inspection or any subsequent inspection or other inspections discovers major defects, Buyer shall provide Seller with a written request for repairs and a copy of the relevant portions of the inspection report(s). All inspections shall be at the direction and expense of Buyer, (unless requested by Seller for negotiations which shall then be at the direction and expense of Seller), performed by a licensed contractor/professional, and completed within the time frames provided herein. The Broker(s) shall not be responsible for determining the necessity of additional inspections. Buyer and Seller agree that Broker(s) does not guarantee, and will not be held responsible for, any person or company performing the inspection or correction of any condition pursuant to the terms of this Agreement and shall not be responsible for the selection of any person or company chosen to perform an inspection or correct any condition.

The request for repairs must be made by the deadline specified. Seller shall then, in writing:

(a)  Agree to correct any major defects at Seller's sole cost and, if necessary, by a licensed contractor/professional. All required permits must be secured by Seller. Written proof of completion shall be supplied to buyers at least two (2) days prior to settlement; OR

(b)  Refuse to correct the major defects; OR

(c)  Enter into a mutually agreeable written agreement with Buyer providing for particular repairs to the Property and/or credit to Buyer at Settlement if this is acceptable to the mortgage lender.

If the Seller refuses to correct the major defects, fails to respond in writing to Buyer's request concerning major defects as identified in the inspection report(s), or an agreement about such repairs is not negotiated, then Buyer may notify Seller in writing, no later than one (1) day after the date written negotiations are to be completed as specified above, of Buyer's intent to purchase the Property in its present condition or this Agreement shall be null and void and all deposit money shall be returned to Buyer in accordance with the terms of this Agreement.

It is understood that general statements as to the condition of the Property contained in this Agreement, such as "electrical system shall be in working order at the time of settlement," will not obligate Seller to repair items noted in the Home Inspection Report unless Seller agrees to make repairs according to the terms of the Home Inspection Contingency.

Seller will have all items and systems covered by this Inspection operative at the time of inspection (including fuels). Seller shall not be obligated to repair any defects fully disclosed in the Seller's Disclosure of Real Property Condition Report or defects otherwise accepted by Buyer in this Agreement. However, specific actions required by this Agreement, such as "repair defective electric outlet in the kitchen," will remain part of this Agreement.

**22.    OTHER INSPECTIONS.** The purpose of these inspections is to independently evaluate the condition of the items and identify major defects, if any. A major defect is any deficiency or condition in an item that causes the item to perform in an unsafe manner or that prevents the item from performing its intended function. Buyer must object to any major defect identified by an inspection report by the date the report is due to Seller as listed below, or Buyer is deemed to have accepted Property with the defect and the contingency is automatically considered to be satisfied. If this Agreement is cancelled as a result of the election of any of the options below, all parties agree to immediately execute the proper documentation to acknowledge termination of this Agreement of Sale. There shall then be no further obligation or liability of either party, Broker(s) or Agent(s) Salesperson(s), and all monies on deposit shall be returned to Buyer in accordance with the terms of this Agreement. Buyer and Seller agree that Broker(s)/Agent(s) does not guarantee, and will not be held responsible for, any person or company performing the inspection or correction of any condition pursuant to the terms of this Agreement and will not be responsible for the selection of any person or company chosen to perform an inspection or correct any condition. Unless otherwise noted in Paragraph 32, Buyer assumes the risk of the condition of items that cannot be adequately inspected due to weather or other conditions not under Seller's control. Each included contingency is subject to the terms and remedies described herein.

**a.    ON-SITE WASTEWATER/SEPTIC SYSTEM.**
For all properties utilizing an on-site wastewater/septic system that are sold or otherwise transferred to other ownership, the Seller shall have the system pumped out and inspected by a Class F and Class H licensee, respectively, prior to completion of the sale. If an inspection has occurred within the previous thirty-six (36) months and the Seller can provide proof of the pump out and inspection and the system is not a cesspool or seepage pit, then the inspections will suffice. It will be the Seller's sole cost and responsibility to provide the Buyer with the report (Class F and Class H) indicating that the system is in working order with no major defects by _____ (date). If the Seller of an individual on-site wastewater/septic system provides proof of a licensed operator or has a service contract with a certified service provider then the Seller shall provide evidence of same to Buyer no later than the date specified herein and these requirements shall have been met. In the event the system fails "___ ction and a replacement system is required, Seller reserves the right to install a new system in conform ___ rules and regulations subject to Buyer

Seller's Initials _____    Buyer's Initials _____

©Copyright 2009-2019 by Delaware Association of REALTORS®. All Rights Reserved. Revised March 7, 2019. This form has been created exclusively for the use of the association members and those with written permission. The use of this form for any transaction that does not involve the participation of an association member is strictly prohibited and is in violation of Federal Copyright laws.

approval. Buyer has the option within five (5) days of written notification of the type and location of proposed replacement system to accept or declare this Agreement null and void. Lack of response from Buyer shall constitute acceptance of this Agreement.

**b.** _____ **On-Site Wastewater/Septic Contingency (Buyer's Option).**
(Only a part of this Agreement if marked yes or checked)
Notwithstanding the provisions of 22a herein, the Buyer may elect to have their own on-site wastewater/septic system inspection by a Class H system inspector (see list at www.dnrec.delaware.gov) of Buyer's choice and at Buyer's expense, to verify that the on-site wastewater/septic system is in working order with no major defects. This shall be in addition to 22a herein and shall not relieve the Seller from the provisions of 22a. In such event Buyer must provide Seller with a copy of the written report describing any major defect by _____ (date).

**NOTICE TO BUYER:** in the event regulations allow this transaction to qualify for an inspection to be delayed until after settlement, and no inspection is completed prior to settlement, Buyer is hereby notified that the system must be inspected within ninety (90) days after settlement in conformity with DNREC regulations. Buyer accepts any responsibility for any upgrades or replacement at that time.

**c.** _____ **Well Water Contingency.** (Only a part of this Agreement if marked yes or checked)
Buyer may have the water inspected by a water testing company of Buyer's choice, at Buyer's expense, to verify that the well is in working order with no major defects, and there is an absence of total coliform bacteria, and meets EPA standards for nitrate, chloride, and lead. Buyer must provide Seller with a copy of the written report describing any major defect.
Report of major defects, if any, due to Seller by _____ (date).

**d.** __Yes__ **Radon Contingency.** (Only a part of this Agreement if marked yes or checked)
Buyer may have Property inspected by a registered radon service company of Buyer's choice, at Buyer's expense, to verify that the average radon level is less than four (4) picocuries/liter. Buyer must provide Seller with a copy of the written report containing any evidence of higher radon levels than herein stated.
Report of major defects, if any, due to Seller by _____ **November 18, 2020** _____ (date).

**e.** _____ **Swimming Pool Contingency.** (Only a part of this Agreement if marked yes or checked)
Buyer may have the swimming pool inspected by a pool maintenance company of Buyer's choice, at Buyer's expense, to verify that the pool & equipment are in working order with no major defects. Buyer must provide Seller with a copy of the written report describing any major defect.
Report of major defects, if any, is due to Seller by _____ (date).

**SELLER'S DUTIES.** In the event Seller provides Buyer or Buyer provides Seller timely written notice of a major defect of any of the above required or selected items, the Seller shall notify Buyer within five (5) days of said notice whether Seller: (a) intends to correct the major defect(s) at Seller's sole cost prior to settlement, (b) refuses to correct any of the major defects, or (c) offers to negotiate with Buyer about the major defects with such negotiations to be completed within five (5) additional days from date of Seller's notification. If the negotiations are not completed in the time specified above or Seller fails to provide written notification, then this shall mean that Seller has refused to correct the major defect.

**BUYER'S DUTIES.** If Seller has refused to correct the major defect or a negotiated agreement to correct major defects is not agreed to, then Buyer must notify Seller in writing within five (5) days of receiving Seller's notice whether Buyer will (a) accept Property with the defect and no reduction of price or (b) declare the Agreement null and void with all deposit money being returned to Buyer. Buyer's failure to provide written notice shall result in this Agreement becoming null and void and all deposit money shall be returned to Buyer in accordance with the terms of this Agreement.

**23. ENVIRONMENTAL CONDITIONS.** Buyer is hereby advised that environmental conditions may exist about which Seller has no knowledge including but not limited to: buried fuel tanks, asbestos, radon, lead paint, mold and urea-formaldehyde foam insulation. Buyer may negotiate with Seller for permission to conduct environmental testing as a term or condition of this Agreement. Any agreement relating to environmental testing must be in writing and signed by both Buyer and Seller. Further information can be obtained from the following agencies: United States Environmental Protection Agency, Washington D.C.; Radon Health Systems Protection, Dover DE; State of Delaware Department of Health and Social Services, Dover DE; United States Consumer Products, Safety Commission, Washington D.C.

**24. BUYER'S DEFAULT.** If Buyer fails to deliver any payment or additional deposit; fails to make mortgage application as specified herein; knowingly furnishes false or incomplete information to Seller, Broker or the lending institution concerning Buyer's legal or financial status; fails to cooperate in the processing of the mortgage loan application, resulting in failure to obtain a mortgage financing commitment; or violates or fails to perform any of the terms or conditions of this Agreement, and Seller shall not also be in default; then Seller shall have the right and option to cancel this Agreement and to retain any deposit money as liquidated damages for such default by Buyer, or exercise any legal or equitable right or remedy to which Seller may be entitled and in connection therewith to apply any deposit money either on account of the Purchase Price or on account of damages, as Seller may elect.

**25. SELLER'S DEFAULT.** If Seller shall, for some reason not excused herein, fail or refuse to perform his obligation to Buyer, and Buyer shall not also be in default, Buyer shall either have all monies paid herein on account of the Purchase Price (together with such reasonable costs incurred in preparation for settlement) refunded forthwith, whereupon all rights and obligations herein shall cease and terminate, or Buyer shall _____ ek any remedy and maintain any action against Seller to which Buyer may be entitled whether at law or in e

Seller's Initials _____ Buyer's Initials _____

©Copyright 2009-2019 by Delaware Association of REALTORS®. All Rights Reserved. Revised March 7, 2019. This form has been created exclusively for the use of the association members and those with written permission. The use of this form for any transaction that does not involve the participation of an association member is strictly prohibited and is in violation of Federal Copyright laws.

**26.     NO REPRESENTATION.** Buyer and Seller understand and acknowledge that Broker(s) are not at any time authorized to make any representations about this Agreement or the Property other than those written in this Agreement. Broker(s), Agent(s), Subagent(s) and employees of Broker(s) do not assume any responsibility for the condition of the Property or for the performance of this Agreement by any or all parties hereto. By signing this Agreement, Buyer and Seller acknowledges they have not relied on any representations made by Broker(s) or any Agent(s), Subagent(s) or employees of Broker(s), except those representations written in this Agreement.

**27.     INDEMNIFICATION/ATTORNEY FEES.** In the event any dispute arises under this Agreement between Seller and Buyer resulting in Broker(s) or any Agent(s), or Subagent(s) or employees of Broker(s) being a party to any litigation, Seller or Buyer, whichever is unsuccessful, shall indemnify and hold Broker(s), Agent(s), Subagent(s) or employees of Broker(s) harmless from any liability, loss, damage, cost, expense, and attorney fees, provided such litigation does not result in a judgment against Broker(s), Agent(s), Subagent(s) or employees of Broker(s) for acting improperly under this Agreement.

Should Buyer waive any inspections or provisions in this Agreement of Sale, either as the result of marking the item NO, failing to mark the item YES, or not following through with an inspection, Buyer shall hold Broker(s), Agent(s), Subagent(s) or employees of Broker(s) harmless from any liability, loss, damage, cost, expense, and attorney fees resulting from Buyer's waiver of such provision. In the event a dispute arises under this Agreement between Seller and Buyer resulting in any litigation, and/or arbitration, Buyer or Seller, whichever is unsuccessful, shall also be liable for the other parties' court costs and attorney fees.

**28.     AGENCY DISCLOSURE.** As disclosed in the Consumer Information Statement of the Delaware Real Estate Commission, the parties confirm that the following agency relationships exist:

I.      _____**Patterson-Schwartz-Hockessin**_____, Listing Broker
        [X] Seller's Agent          [ ] Dual Agent

II.     _____**Kathy Eddins**_____, Designated Listing Agent
        [X] Seller's Designated Agent      [ ] Designated Dual Agent

III.    _____**Weichert Realtors Pike Creek**_____, Selling Broker
        [X] Buyer's Agent      [ ] Dual Agent      [ ] Seller's Subagent

IV.     _____**Debra Coe**_____, Designated Selling Agent
        [X] Buyer's Designated Agent      [ ] Designated Dual Agent      [ ] Seller's Subagent

**29.     SUCCESSION.** This Agreement shall benefit and bind the parties hereto, their respective heirs, personal representatives, successors and assigns. Buyer may not assign Buyer's interest in this Agreement without Seller's prior written consent, which consent will not be withheld unless such assignment may adversely affect Seller.

**30.     BROKERAGE FEE.** Buyer and Seller agree that the Broker(s)/Agent(s) was responsible for procuring this Agreement, and agree that a brokerage fee for services rendered as specified in a separate agreement for compensation will be paid. If not previously paid, the settlement attorney is hereby irrevocably authorized and directed to collect the brokerage fee as specified in the separate agreement and pay the same to the Broker at final settlement as a convenience to the parties, and not as a limitation upon Buyer's or Seller's liability to pay the brokerage fee.

**31.     ADDENDUMS.** These Addendums are only applicable if marked **YES** or checked. **NO** or a blank means you are waiving the opportunity to include the contingency or clause. If language in this Agreement and Addendum(s) are in conflict, unless otherwise provided herein, then the addendum(s) will supersede this Agreement.

  _Yes_   Seller's Disclosure of Real Property Condition Report, unless exempt by State Law (additional form required)
  _Yes_   Lead Based Paint Disclosure Form, unless exempt by Federal Law (additional form required)
  _Yes_   Radon Disclosure Form, unless exempt by State law (additional form required)
  _____   DUCIOA Resale Certification Form (if applicable) OR _____ Contingency Addendum (check which applies)
  _____   Tax Deferred (1031) Exchange
  _____   Buyer's Financial Information
  _Yes_   Mortgage Letter with Credit Check
  _____   FHA Amendatory Language and _For Your Protection: Get a Home Inspection_ (additional form required)
  _____   VA Amendatory Language
  _____   Homeowners Warranty paid for by _____ Warranty Company _____
  _____   Additional Addenda not included above _____

**32.     ADDITIONAL TERMS AND CONDITIONS. Property to appraise at purchase price.**
_____
_____

Seller's Initials _____          Buyer's Initials _____

©Copyright 2009-2019 by Delaware Association of REALTORS®. All Rights Reserved. Revise             s been created exclusively for the use of the association members and those with written permission. The use of this form for any transaction that does not involve the participation of an association member is strictly prohibited and is in violation of Federal Copyright laws.

**33.    MISCELLANEOUS.** Delaware law governs this Agreement. The Paragraph captions are for convenient reference only and are not intended to limit or enlarge the substance of this Agreement. The term Broker(s) when used in this Agreement shall include Broker of Record, Brokerage Organization, Broker Owner, Salesperson(s) and employees involved in this Agreement. The word "Contract" is synonymous with "Agreement" when used herein.

The singular forms "Buyer" and "Seller" are used in this Agreement solely as a convenience and are intended to include all parties who are Buyers or Sellers. Buyer and Seller agree that they have read and fully understand this Agreement, including the Seller's Disclosure of Real Property Condition Report (if applicable), that it contains the entire agreement between them and that they do not rely on any other written or oral representation or statement not expressly written in this Agreement, including any statement of fact or opinion contained in any advertisement, listing agreement, multiple listing description or multiple listing information sheet or made by Seller, any broker, salesperson, or any agent or employee of any of them. If settlement does not take place Buyer and Seller shall each be responsible to pay for services ordered on their behalf, unless otherwise provided for herein. The parties hereto agree to execute and deliver any other instrument(s) or document(s) that may be necessary or convenient to carry into effect the provisions of this Agreement, and the parties agree to otherwise cooperate in good faith as may be necessary to complete the settlement contemplated herein. All days referenced herein are calendar days with the first day beginning on the day after the event. A day ends at midnight. For example, if a notification is delivered on June 3 at 11:00 a.m., then the first day is June 4 ending at midnight.

**34.    CHANGES.** There have been changes in the form of this Agreement as copyrighted by the Delaware Association of REALTORS® other than filling in the blanks. ☐ Yes ☒ No. If yes, describe changes.

_____

**35.    ENTIRE AGREEMENT.** This Agreement and any addenda hereto contain the final and entire Agreement between the parties and may not be modified or changed except by written agreement signed by all parties. The parties agree that neither they nor their Broker(s)/Agent(s) shall be bound by any terms, conditions, statements, warranties nor representations, oral or written, not contained herein. FAILURE TO CHECK OR MARK A BOX "YES" MEANS BUYER HAS WAIVED THE RIGHT TO INCLUDE THE CONTINGENCY OR CLAUSE AS PART OF THIS AGREEMENT.

**36.    FINAL ACCEPTANCE.** This Agreement is not binding until signed by all parties and delivered to them or their designated agents.

**IN WITNESS WHEREOF**, the parties have signed this Agreement on the date stated below, thereby showing their intent to be bound hereby.

| | | |
|---|---|---|
| | | 11/3/2020 \| 11:12 AM PST |
| BUYER **Brian Balzer** | | DATE & TIME |
| B5EE04C0819... | | 11/3/2020 \| 2:30 PM EST |
| BUYER **Tsai-Yuan Liu** | | DATE & TIME |
| 78A2A8C09D1C435... | | |
| SELLER **D...** | | DATE & TIME |
| | | 11/3/2020 \| 2:38:05 PM PST |
| SELLER **N...** | | DATE & TIME |
| 9FA74B1ABB3E454... | | 11/3/2020 \| 3:29:55 PM EST |

**SELLER HEREBY REJECTS** this offer as of _____

_____     DATE & TIME
SELLER                                                SELLER

_____

**All contact information below is included for informational purposes only and should not be construed as part of this contract.**

| | | |
|---|---|---|
| **Patterson-Schwartz-Hockessin** | **PS LANC** | **Weichert Realtors Pike Creek**        **WEIC-LIM** |
| NAME OF LISTING (SELLER'S) BROKERAGE    CODE | | NAME OF SELLING (BUYER'S) BROKERAGE    CODE |
| **7234 Lancaster Pike** | | **4760 Limestone Rd** |
| **Hockessin, DE  19707** | | **Wilmington, DE  19808-1928** |
| ADDRESS | | ADDRESS |
| | | **RM-0000332** |
| DELAWARE LICENSE ID (BROKERAGE) | | DELAWARE LICENSE ID (BROKERAGE) |
| **Kathy Eddins** | | **Debra Coe** |
| LISTING AGENT                                   CODE | | SELLING AGENT                                   CODE |
| **R3-0016319** | | **RS-0018671** |
| DELAWARE LICENSE ID (LISTING AGENT) | | DELAWARE LICENSE ID (SELLING AGENT) |
| **eddinshanna@psre.com** | | **debracoe@comcast.net** |
| EMAIL | | EMAIL |
| **(302)893-4373** | | **(302)584-7886** |
| PHONE NUMBER | | PHONE NUMBER |

| Deposit received: $ _____ | : ☐ Cash ☐ Check # _____ | Effective/ratification date of Agreement _____ |
|---|---|---|

©Copyright 2009-2019 by Delaware Association of REALTORS®. All Rights Reserved. Revised March 7, 2019. This form has been created exclusively for the use of the association members and those with written permission. The use of this form for any transaction that does not involve the participation of an association member is strictly prohibited and is in violation of Federal Copyright laws.



## Certificate Of Completion

Envelope Id: 8D14CCC113594249BFD21845E6171385  
Subject: Please DocuSign: contract 12 Autumnwood.pdf  
Source Envelope:  
Document Pages: 9    Signatures: 1    Envelope Originator:  
Certificate Pages: 5    Initials: 17    Kathy Eddins  
AutoNav: Enabled        7234 Lancaster Pike  
EnvelopeId Stamping: Enabled        Hockessin, DE 19707  
Time Zone: (UTC-05:00) Eastern Time (US & Canada)        keddins@psre.com  
        IP Address: 76.99.200.170

## Record Tracking

Status: Original    Holder: Kathy Eddins    Location: DocuSign  
        11/3/2020 3:19:48 PM            keddins@psre.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Marc Comer<br>marc.comer@gmail.com<br>Security Level: Email, Account Authentication (None) | <br>Signature Adoption: Pre-selected Style<br>Using IP Address: 108.52.137.82 | Sent: 11/3/2020 3:25:44 PM<br>Viewed: 11/3/2020 5:37:13 PM<br>Signed: 11/3/2020 5:38:05 PM |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 10/22/2020 1:16:05 PM<br>   ID: c73f39ab-810a-40ba-9d06-d950e9f63065 | | |
| Nicole Comer<br>nbolt16@icloud.com<br>Security Level: Email, Account Authentication (None) | <br>Signature Adoption: Drawn on Device<br>Using IP Address: 107.77.203.50<br>Signed using mobile | Sent: 11/3/2020 3:25:44 PM<br>Viewed: 11/3/2020 3:29:13 PM<br>Signed: 11/3/2020 3:29:55 PM |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 11/3/2020 3:29:13 PM<br>   ID: 1578b093-520b-40cb-8363-5f82d35188cc | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 11/3/2020 3:25:44 PM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Certified Delivered | Security Checked | 11/3/2020 3:29:13 PM |
| Signing Complete | Security Checked | 11/3/2020 3:29:55 PM |
| Completed | Security Checked | 11/3/2020 5:38:05 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## CONSUMER DISCLOSURE

From time to time, Patterson-Schwartz Real Estate (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the â€˜I agreeâ€™ button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign â€˜Withdraw Consentâ€™ form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures

electronically from us.

**How to contact Patterson-Schwartz Real Estate:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

 To contact us by email send messages to: skennedy@psre.com


**To advise Patterson-Schwartz Real Estate of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at skennedy@psre.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from Patterson-Schwartz Real Estate**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to skennedy@psre.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Patterson-Schwartz Real Estate**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
>
> ii. send us an e-mail to skennedy@psre.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
|---|---|
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to

other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the â€˜I agreeâ€™ button below.

By checking the â€˜I agreeâ€™ box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC CONSUMER DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Patterson-Schwartz Real Estate as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Patterson-Schwartz Real Estate during the course of my relationship with you.

DocuSign Envelope ID: 93599557-B335-4986-B5C9-6C85C116FD89

# ADDENDUM TO AGREEMENT OF SALE

## ADDENDUM # _____

SELLER: **Dudley M Comer, Nicole Comer**

BUYER: **Brian Balzer, Tsai-Yuan Liu**

PROPERTY:  **12 Autumnwood Dr, Newark, DE  19711-2400**

Effective/Ratification date of Agreement of Sale: **November 3, 2020**

It is understood and agreed that the above Agreement of Sale shall be amended as follows:

**As sighted in the home inspection,  Sellers shall have certified licensed contractor(s)  repair, replace and or make remedy the following:**

**Plumbing:1. Replace deteriorated vent collar  - see page 22**
         **2. Correct improperly installed drain under kitchen sink  - see page 22**
         **3. Evaluate and repair source of Sewage Odor at the injector pump area for possible leak or improper venting and install a failure to function alarm on pump - pg 22**
         **4. Repair leaking faucet handle in master bathroom.   - see page 23**
         **5. Secure loose toilet in Hall Bath**

**6. Secure loose siding at upper right gable   -  see page 21**

All other terms and conditions of the Agreement of Sale remain unchanged and in full force and effect.

BUYER _____  Date & Time  11/13/2020 | 1:48 PM PST
Brian Balzer

BUYER _____  Date & Time  11/13/2020 | 8:46 PM EST
Tsai-Yuan Liu

SELLER _____  Date & Time  11/17/2020 | 10:21:04 AM PST
Dudley M Comer

SELLER _____  Date & Time  11/17/2020 | 11:07:20 AM EST
Nicole Comer

Copyright 2015 Delaware Association of REALTORS®. All Rights Reserved. Last modified June 4, 2015. For use by REALTOR® members of the Delaware Association of REALTORS® only.



## Certificate Of Completion

Envelope Id: 93F09557B325408685C86C2CC116ED89 Status: Completed
Subject: Please DocuSign: Autumnwood repair adden.pdf
Source Envelope:
Document Pages: 1                Signatures: 2              Envelope Originator:
Certificate Pages: 5             Initials: 0                Kathy Eddins
AutoNav: Enabled                                            7234 Lancaster Pike
EnvelopeId Stamping: Enabled                                Hockessin, DE  19707
Time Zone: (UTC-05:00) Eastern Time (US & Canada)           keddins@psre.com
                                                            IP Address: 76.99.200.170

## Record Tracking

Status: Original                 Holder: Kathy Eddins        Location: DocuSign
        11/17/2020 8:55:49 AM            keddins@psre.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Marc Comer<br>marc.comer@gmail.com<br>Security Level: Email, Account Authentication (None) | <br>Marc Comer<br>5769D6E216AF492...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 108.52.137.82 | Sent: 11/17/2020 8:59:17 AM<br>Viewed: 11/17/2020 10:37:37 AM<br>Signed: 11/17/2020 1:21:04 PM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 10/22/2020 1:16:05 PM<br>    ID: c73f39ab-810a-40ba-9d06-d950e9f63065 | | |
| Nicole Comer<br>nbolt16@icloud.com<br>Security Level: Email, Account Authentication (None) | <br>9FA74B1ABB3E454...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 76.98.61.211<br>Signed using mobile | Sent: 11/17/2020 8:59:16 AM<br>Viewed: 11/17/2020 11:07:07 AM<br>Signed: 11/17/2020 11:07:20 AM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 11/17/2020 11:07:07 AM<br>    ID: b0fcad28-d522-43b6-948d-ea4488d40961 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 11/17/2020 8:59:17 AM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Certified Delivered | Security Checked | 11/17/2020 11:07:07 AM |
| Signing Complete | Security Checked | 11/17/2020 11:07:20 AM |
| Completed | Security Checked | 11/17/2020 1:21:04 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## CONSUMER DISCLOSURE

From time to time, Patterson-Schwartz Real Estate (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the â€˜I agreeâ€™ button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign â€˜Withdraw Consentâ€™ form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures

electronically from us.

**How to contact Patterson-Schwartz Real Estate:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

To contact us by email send messages to: skennedy@psre.com


**To advise Patterson-Schwartz Real Estate of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at skennedy@psre.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from Patterson-Schwartz Real Estate**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to skennedy@psre.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Patterson-Schwartz Real Estate**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

     i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

     ii. send us an e-mail to skennedy@psre.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
| --- | --- |
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to

other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the â€˜I agreeâ€™ button below.

By checking the â€˜I agreeâ€™ box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC CONSUMER DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Patterson-Schwartz Real Estate as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Patterson-Schwartz Real Estate during the course of my relationship with you.

**EFiled: Dec 01 2020 01:51PM EST**
**Transaction ID 66149332**
**Case No. N20C-11-086 JRJ**

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

KMI GROUP, INC.,       )
                      )
         Plaintiff,   )
                      )
        v.           )     C.A. No. N20C-11-086 JRJ
                      )
NICOLE BOLT COMER,   )
                      )
         Defendant.  )

## NOTICE OF MOTION

PLEASE TAKE NOTICE that Defendant's Emergency Motion for Mandatory Cancellation of Lis Pendens Pursuant to 25 *Del. C.* § 1606 will be presented at the convenience of the Court.

Dated: December 1, 2020          REED SMITH LLP

                                 */s/ Mark W. Eckard*
                                 Brian M. Rostocki (No. 4599)
                                 Mark W. Eckard (No. 4542)
                                 1201 North Market Street, Suite 1500
                                 Wilmington, DE 19801
                                 Telephone: (302) 778-7500
                                 Facsimile: (302) 778-7575

                                 *Counsel for Defendant*

EFiled: Dec 01 2020 01:51PM EST
Transaction ID 66149332
Case No. N20C-11-086 JRJ

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| KMI GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N20C-11-086 JRJ |
| | ) | |
| NICOLE BOLT COMER, | ) | |
| | ) | |
| Defendant. | ) | |

## [PROPOSED] ORDER

Upon consideration of Defendant's Emergency Motion for Mandatory Cancellation of *Lis Pendens* Pursuant to 25 *Del. C.* § 1606 (the "Motion"), and any response thereto,

IT IS HEREBY ORDERED, this ___ day of _____ 2020, that the Motion is GRANTED and:

1.  New Castle County Recorder, pursuant to 25 *Del. C.* § 1606, shall cancel the *Lis Pendens* of record and mark the indices accordingly; and

2.  Plaintiff, pursuant to 25 *Del. C.* § 1611 shall pay damages suffered by Defendant resulting from the recordation of the *Lis Pendens*, including her attorneys' fees and costs incurred in connection with this Motion.

_____
The Honorable Jan R. Jurden

EFiled: Dec 01 2020 01:51PM EST
Transaction ID 66149332
Case No. N20C-11-086 JRJ

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| KMI GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N20C-11-086 JRJ |
| | ) | |
| NICOLE BOLT COMER, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I, Mark W. Eckard, hereby certify that on this 1st day of December 2020, I caused a true and correct copy of (i) *Defendant's Emergency Motion for Mandatory Cancellation of Lis Pendens Pursuant to 25 Del. C. § 1606* **(including Notice and Proposed Order)**, (ii) *Exhibits A and B to Defendant's Emergency Motion for Mandatory Cancellation of Lis Pendens Pursuant to 25 Del. C. §* 1606, and (iii) this *Certificate of Service* to be served on the following counsel of record via File & Serve*Xpress*:

Paul D. Brown
Tayler D. Bolton
CHIPMAN BROWN CICERO & COLE, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801

Dated: December 1, 2020                    REED SMITH LLP

                                           */s/ Mark W. Eckard*
                                           Brian M. Rostocki (No. 4599)
                                           Mark W. Eckard (No. 4542)
                                           1201 North Market Street, Suite 1500
                                           Wilmington, DE 19801
                                           Telephone:  (302) 778-7500
                                           Facsimile:  (302) 778-7575

                                           *Counsel for Defendant*

# Exhibit M

**EFiled: Feb 01 2021 12:17PM EST**
**Transaction ID 66298694**
**Case No. N20C-11-086 JRJ**

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|                          |     |                           |
|--------------------------|-----|---------------------------|
| KMI GROUP, INC.,         | )   |                           |
|                          | )   |                           |
|     Plaintiff, | )   |                           |
|                          | )   |                           |
|     v. | )   | C.A. No. N20C-11-086 JRJ  |
|                          | )   |                           |
| NICOLE BOLT COMER,       | )   |                           |
|                          | )   |                           |
|     Defendant. | )   |                           |

Date Submitted:    December 1, 2020
Date Decided:      February 1, 2021

## ORDER

Upon consideration of Defendant's request that the Court award attorneys' fees and costs in connection with Defendant's Motion for Mandatory Cancellation of *Lis Pendens* pursuant to 25 *Del. C.* § 1611, **IT APPEARS THAT:**

1. On December 1, 2020, Defendant filed an Emergency Motion for Mandatory Cancellation of *Lis Pendens*[1] ("Motion") pursuant to 25 *Del. C.* § 1606, requested an emergency hearing on the Motion,[2] and asked that Plaintiff be directed to pay Defendant's attorneys' fees and costs incurred in connection with the Motion.[3]

2. The *lis pendens* at issue was recorded against Defendant's personal residence in connection with Plaintiff's complaint ("Complaint"), which asserts one

---

[1] D.I. 5.
[2] D.I. 6.
[3] D.I. 5 ¶ 15.

claim for money damages arising out of an alleged breach of a personal guaranty not involving the Defendant's residence.[4]

3.   Before filing the Motion, Defendant contacted Plaintiff's counsel and requested the *lis pendens* be canceled and offered various assurances to show the sale of her home was unrelated to the alleged breach of personal guaranty pled in the Complaint.   The Defendant also provided a copy of the contract for sale of Defendant's residence. [5]   When Plaintiff failed to cancel, Defendant moved for mandatory cancellation of the *lis pendens* pursuant to 25 *Del. C.* § 1606.   Section 1606 mandates cancellation when the claim asserted, if sustained, "would entitle the party solely to recover money or money damages."[6]

4.   The Court scheduled an emergency hearing via teleconference on Defendant's Motion for December 3, 2020.   One hour before the hearing, Plaintiff's counsel wrote to inform the Court that Plaintiff agreed to file a notice of cancellation of the *lis pendens* with the Recorder of Deeds, and as such, the emergency hearing was no longer necessary.[7]

---

[4] D.I. 1.   Plaintiff alleged Defendant was attempting to fraudulently transfer assets to avoid a judgment collection in this action by selling her personal residence. D.I. 5 ¶ 2.
[5] D.I. 5 ¶ 7.
[6] 25 *Del. C.* § 1606(3).
[7] D.I. 7.

5.    The Court instructed the parties that the scheduled teleconference would go forward.  Following discussion with the parties, the Court instructed Plaintiff's counsel to submit a letter explaining why it was appropriate to record the *lis pendens* and why attorneys' fees should not be assessed,[8] and instructed Defendant to submit an affidavit setting forth the fees and costs she incurred in connection with the Motion.[9]

6.    As Defendant correctly notes in her Motion, the *lis pendens* recorded in this action was improper under the statute because it was recorded on a property with no relation to Plaintiff's claim. [10]  25 *Del. C.* § 1601(a) permits a party "asserting a claim, the object of which is to affect the title to, or enforce an equitable lien on, real estate[,]" to file a notice of pendency of the action with the recorder of deeds of any county.[11]  The Delaware Supreme Court has held that a fundamental requirement of the *lis pendens* doctrine is that the underlying litigation must be "addressed to the title or other interests in a specific and identified parcel of land."[12]

7.    Further, 25 *Del. C.* § 1601(b)(1) prohibits filing a notice of pendency where the "claim relating to real estate which, if sustained, would entitle the party to

---

[8] D.I. 9.
[9] D.I. 8, D.I. 14.  The Court also provided Defendant with an opportunity to respond to Plaintiff's argument against assessing attorneys' fees. D.I. 12.  Finally, the Court allowed Plaintiff to contest the reasonableness of the attorneys' fees requested by Defendant. D.I. 16.
[10] 25 *Del. C.* §§ 1601(b)(1), 1606(3).
[11] *Id.* § 1601(a).
[12] *DiSabatino v. Salicete*, 695 A.2d 1118, 1119 (Del. 1997).

recover solely of money or money damages[.]"[13]  This same language is repeated in § 1606(3) of the statute, as a circumstance which requires mandatory cancellation of the notice of pendency.[14]

8.    Pursuant to 25 *Del. C.* § 1611, a court may award reasonable attorneys' fees to the prevailing party if the court finds that the party against which the attorneys' fees are to be assessed has "wilfully asserted a claim or defense thereof without foundation in law or fact[.]"[15]

9.    Defendant avers she incurred $16,097.00 in legal fees and costs in connection with the *lis pendens*, including but not limited to filing and pursuing the Motion, investigating the factual and legal bases for the *lis pendens*, preparing for the hearing, correspondence with opposing counsel, and preparing and filing a reply to Plaintiff's Filing Addressing the Basis for Recording a *Lis Pendens*.[16]

10.    Plaintiff acknowledges that recording a *lis pendens* in this case appears improper at first glance, but argues that its allegations of Defendant's fraudulent transfer of real property provide a sufficient connection to real estate such that a notice of pendency is appropriate.[17]    This argument is tenuous at best.    The

---

[13] 25 *Del. C.* § 1601(b)(1).
[14] *Id.* § 1606(3).
[15] *Id.* § 1611.
[16] *See* D.I. 10.
[17] D.I. 9.  Plaintiff relies on a Chancery Court decision for the proposition that a *lis pendens* may be recorded in conjunction with a claim that a defendant seeks to fraudulently transfer interests in

underlying litigation at issue here is separate from the sale of Defendant's personal property–it involves a dispute over a contract between two businesses, Plaintiff's and Defendant's business, and alleges a single claim for breach of personal guaranty. The statute unambiguously requires the purpose of the underlying claim to be one that "affects the title to, or enforce an equitable lien on, real estate[.]"[18] That requirement is not satisfied here.

11.   The Court finds Plaintiff recorded the *lis pendens* against Defendant's personal property in violation of the express terms of 25 *Del. C.* §§ 1601(a) and (b)(2).  The Court has considered Plaintiff's argument regarding the reasonableness of the attorneys' fees and costs sought by Defendant but finds attorneys' fees and costs in the amount of $16,097.00 to be reasonable.

**WHEREFORE, IT IS HEREBY ORDERED** that Plaintiff shall pay Defendant's attorneys' fees and costs totaling $16,097.00 in connection with the Motion for Mandatory Cancellation of *Lis Pendens*.

---

real property, even if the plaintiff may also receive monetary damages from the claim if sustained. *See Luchi v. Luchi*, 2020 WL 1274879, at *5 (Del. Ch. Mar. 17, 2020). This reliance is misguided. In *Luchi*, the underlying litigation involved a claim that the Defendant fraudulently conveyed his real property interest to a third party to hinder, delay, or defraud the Plaintiff as his creditor, brought under the Delaware Uniform Fraudulent Transfer Act ("DUFTA").  Unlike in *Luchi*, the underlying litigation here is unrelated to the Defendant's real property interest or DUFTA–it involves an alleged breach of personal guaranty in connection with Defendant's business.
[18] *See supra* note 11.

*Jan R. Jurden*

_____

Jan R. Jurden, President Judge


cc:    Prothonotary

# Exhibit N

EFiled: Dec 21 2020 11:27AM EST
Transaction ID 66200915
Case No. 2020-1033-JRS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

KMI GROUP INC.,                          :
                                         :
                    Plaintiff,           :
                                         :
          v                              :  C. A. No.
                                         :  2020-1033-JRS
NICOLE BOLT COMER,                       :
                                         :
                    Defendant.           :
                                         :

- - -

Chancery Court Chambers
417 South State Street
Dover, Delaware
Wednesday, December 9, 2020
1:30 p.m.

- - -

BEFORE: HON. JOSEPH R. SLIGHTS III, Vice Chancellor

- - -

TELEPHONIC ORAL ARGUMENT and RULINGS OF THE COURT ON
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER
AND MOTION FOR EXPEDITED PROCEEDINGS

------------------------------------------------------------
CHANCERY COURT REPORTERS
Leonard L. Williams Justice Center
500 North King Street - Suite 11400
Wilmington, Delaware 19801
(302) 255-0522

```
 1   APPEARANCES:

 2        PAUL D. BROWN, ESQ.
          TAYLER D. BOLTON, ESQ.
 3        Chipman Brown Cicero & Cole, LLP
                   -and-
 4        DEVIN FREEDMAN, ESQ.
          COLLEEN SMERYAGE, ESQ.
 5        of the Florida Bar
          Roche Cyrulnik Freedman LLP
 6          for Plaintiff

 7        BRIAN M. ROSTOCKI, ESQ.
          MARK W. ECKARD, ESQ.
 8        NICHOLAS R. RODRIGUEZ, ESQ.
          Reed Smith LLP
 9          for Defendant

10

11                              - - -

12

13

14

15

16

17

18

19

20

21

22

23

24
```

3

1            THE COURT:  Good afternoon.  It's Joe
2    Slights on the line.  Can I get appearances, please.
3    First, on behalf of the plaintiff.
4            MR. BROWN:  Good afternoon, Your
5    Honor.  Paul Brown of Chipman Brown Cicero & Cole on
6    behalf of plaintiff, KMI Group Inc.  With me in my
7    office is Tayler Bolton.  Also on the line are my
8    co-counsel, Vel Freedman and Colleen Smeryage.  They
9    are both admitted pro hac, and, with the Court's
10   permission, Mr. Freedman will present argument for KMI
11   today.
12           THE COURT:  All right.  Thank you.
13   Good afternoon.
14           And on behalf of the defendant,
15   please.
16           MR. ECKARD:  Good afternoon, Your
17   Honor.  This is Mark Eckard from Reed Smith on behalf
18   of defendant Nicole Bolt Comer.  With me today on the
19   line are my colleagues from Reed Smith, Brian Rostocki
20   and Nicholas Rodriguez.
21           THE COURT:  All right.  And who will
22   be handling the response?
23           MR. ECKARD:  I will, Your Honor.  Mark
24   Eckard.

CHANCERY COURT REPORTERS

4

```
1                    THE COURT:  All right.  Thank you.
2                    I have had a chance to review the
3    papers, so please know that we're up to speed.  But
4    I'm happy to hear anything that you think I should
5    know in addition or any points you want to emphasize
6    from the papers.
7                    With that, Mr. Freedman, why don't you
8    take us away.
9                    MR. FREEDMAN:  Thank you.  Good
10   afternoon, Your Honor.  And thank you again for
11   hearing us on an expedited basis.
12                   Your Honor, KMI has demonstrated in
13   this case that the defendant, Comer, has a history of
14   evading legal obligations.  She has filed a bankruptcy
15   petition where she has listed herself as a co-debtor
16   of over $4 million worth of loans.  She has defaulted
17   on the lawsuit in Pennsylvania, only recently
18   appearing.  KMI, more importantly, though, has
19   demonstrated that Comer has a history of evading the
20   specific debt that is at issue in this case and has
21   already attempted to use fraudulent means to do so.
22                   First, she caused Comer Enterprises to
23   file a bankruptcy without proper notice to KMI.  She
24   put her home on the market about one week after she
```

5

```
 1   was on notice that KMI and related creditors would be
 2   moving to enforce their rights.  She attempted to move
 3   the closing date from December 10th to December 8th,
 4   after being notified that this TRO application was
 5   coming.  And she blatantly misrepresented the facts in
 6   her sworn declaration, claiming falsely that KMI had
 7   been repaid a little over $90,000, when, in fact, that
 8   wasn't the case.
 9                As Your Honor saw in the reply brief
10   we filed, there were clear text messages
11   contemporaneously that demonstrate these were not
12   repayments of the KMI debt, but for other
13   circumstances, including $14,000 she attempted to
14   defraud the bankruptcy court and the creditors in the
15   bankruptcy out of by moving it out of her account and
16   then right back into her account; a $60,000
17   overpayment, which she refunded because it was an
18   overpayment; and then literal pictures of credit cards
19   and then running the credit cards and then her paying
20   for the use of those credit cards.  Those were not
21   repayment of the KMI debt.
22                Your Honor, in addition, KMI has shown
23   that Comer has engaged in a sustained pattern of
24   wrongful conduct, including using corporate funds for
```

6

 1   her personal use, misappropriating PPP loans.  And KMI
 2   has shown that Comer is insolvent.  Your Honor, we
 3   attached a text message from her -- well, we believe
 4   it was her -- then it was her husband.  Counsel for
 5   Ms. Comer represented it was her ex-husband.  And then
 6   recently she's now sworn that they are still married.
 7   So I'm -- frankly, I'm not sure of the status.  But at
 8   the time, in mid-2019, her husband sent a message to
 9   Mr. Lehrer saying if you talk with these lenders, let
10   them know that they have destroyed my family.  We will
11   lose our house.  We don't have anything left.  There
12   is nothing left.  As of today, I have no income.
13                  THE COURT:  Can I stop you for a
14   moment right there.
15                  What I have now is, under penalty of
16   perjury, a statement from Ms. Comer that she owns this
17   property in joint tenants by the entirety with her
18   husband, who is, if that is true, clearly
19   indispensable in these proceedings, and yet not named.
20   Not to mention the fact that if that is the case,
21   under Delaware law, as I assume in most jurisdictions,
22   this property would not be subject to any
23   post-judgment execution on a debt that Ms. Comer
24   incurred individually.

1          So how do I get past that at this
2  stage?  I mean, you are asking for an injunction
3  related to a property that appears to be at least
4  partially and indivisibly, I should say, owned by
5  someone not before the Court.
6          MR. FREEDMAN:  So, Your Honor, I mean,
7  it's a good question, and it's borne out by the fact
8  that we were not -- we were told by counsel here today
9  that it was an ex-husband.  But assuming she still is
10  married, I think that's -- that issue can be dealt
11  with by the fact that Ms. Comer is in the process, if
12  not currently divorced, in the process of getting
13  divorced.  We are not seeking to stop the actual sale
14  of the house, which would be --
15          THE COURT:  That can't be dealt with
16  today, though.  Mr. Comer is not before the Court.
17  And what you are asking for is restraint relating to a
18  property, either the property itself or proceeds
19  derived from the property, and he's not here to defend
20  that.
21          MR. FREEDMAN:  Your Honor --
22          THE COURT:  I mean, as a matter of due
23  process, much less our rules, Rule 19 in particular,
24  how does the Court even move past that fundamental

1    problem?

2                MR. FREEDMAN:  Well, I think, Your

3    Honor, here, the way to move past it would be to grant

4    the narrow relief we've requested, which is the

5    proceeds of the sale that will become Ms. Comer's that

6    she intends to use to purchase a second house, which

7    does not have her husband's name on it.  So clearly --

8                THE COURT:  Can I stop you there.  The

9    proceeds, based on the record I have before me, are

10   not just Ms. Comer's.  They're Ms. Comer's and her

11   husband's.  That's the record that's in front of me.

12   And he's not here.  So you're asking me to, in a

13   mandatory way, which we'll get to -- not preventative,

14   but in a mandatory way -- on a TRO, direct Ms. Comer

15   to do something with proceeds from a sale of a home

16   that she does not own individually, but in joint

17   tenants by the entirety with her husband.

18                Give me some authority that would

19   allow me to do that in his absence.

20                MR. FREEDMAN:  Your Honor, I can say

21   two things.  One is that we have a case from the Third

22   Circuit, *In re Titus*, which was applying Pennsylvania

23   law that I can say -- the relevant quote is "when a

24   spouse conveys individual property to a tenancy by the

9

1   entireties in fraud of creditors, the creditor may

2   nevertheless execute against the property so

3   conveyed."  I'm not intimately familiar with the case

4   yet, Your Honor.  And I would have to look at it.

5   But --

6               THE COURT:  I think that's

7   fundamentally different.  I'm somewhat familiar with

8   that line of authority, and what that says is if the

9   transaction at issue is an attempted conveyance of the

10  property into a joint tenants by the entirety, that

11  can be restrained.  But this property, from the record

12  I have, has been held in that manner from the get-go.

13              MR. FREEDMAN:  Right.  Your Honor --

14              THE COURT:  So there's nothing

15  fraudulent about that.

16              MR. FREEDMAN:  You are right, Your

17  Honor, there is a distinction there.  And I -- as I

18  was reading it, I made that realization that you are

19  familiar with.

20              I can say this.  We've been -- the

21  Court has been presented with a contract for sale of a

22  property that does not list Ms. Comer's husband's

23  name.  And Ms. Comer has represented to this Court

24  that she intends to use the proceeds of this sale to

1  purchase that second home.  She needs it to do the

2  downpayment on that home.  So, clearly, at some point,

3  Ms. Comer's intention is to take that money out of it

4  being held by the entireties.  Otherwise, she could

5  not purchase a home in her own name and not her

6  husband's name, if it's not being held by the

7  entirety.  So at some point along the chain, money

8  will be distributed that is no longer being held by

9  the entireties and is only being held by Ms. Comer

10 that will be used to purchase a home held only in her

11 name.  And at that point, this Court can affect those

12 proceeds.

13             THE COURT:  Okay.

14             MR. FREEDMAN:  So, Your Honor, as

15 we've shown the Court, beyond the sworn testimony of

16 Mr. Lehrer that she couldn't make the payroll, she

17 couldn't make her mortgage payments, that she was

18 taking corporate and PPP funds and using them

19 inappropriately, she has completely failed to rebut a

20 presumption that she is not insolvent, which she could

21 have done easily by providing a sworn declaration from

22 her CPA showing us her bank account.  Instead, she

23 provided her credit scores, which, Your Honor, she has

24 attempted to manipulate, as we have shown the Court in

1   her text messages.  And, anyway, it doesn't reflect

2   her solvency; it just reflects that she has made

3   minimum payments on time.

4                   Your Honor, turning to the standard of

5   a TRO, a TRO issues if there is a threat of imminent

6   irreparable injury, unless the claim is frivolous or

7   the risk in granting it is not -- is outweighed by the

8   risk of not granting it.  That's because, Your Honor,

9   at this early stage, there hasn't been a chance, like

10  in a preliminary injunction proceeding, there simply

11  hasn't been an opportunity for discovery and a record.

12  Therefore, the focus is on the injury itself.

13                   THE COURT:  Can I stop you for a

14  moment here and ask, on this question of what standard

15  applies, that standard applies to a preventative

16  restraint.  But what you're asking me to do is beyond

17  that, isn't it?  You're asking me to direct this

18  defendant to do something she otherwise would not do,

19  which is to create an escrow account and then to place

20  funds in it.  And in that sense, this is mandatory

21  relief.  And if that is so, under settled law, made

22  perfectly clear by our Supreme Court in 2014 in the

23  *C&J* case, this Court can't do that without a trial or

24  without an undisputed factual predicate, neither of

12

1   which exists here.

2                    So setting aside the indispensable

3   party problem, how do I get to a point where I'm

4   directing Ms. Comer to do something in a preliminary

5   restraining order when we've not had a trial and the

6   facts are absolutely disputed?

7                    MR. FREEDMAN:  So, Your Honor, I think

8   the way to get around that issue is in two ways.  One

9   is, because this is a unique circumstance where the

10  funds are being -- Ms. Comer claims that the proceeds

11  of the sale are then going to be immediately turned

12  around and placed into another sale, that these

13  proceeds will be held by attorneys in trust accounts,

14  and Ms. Comer can just be instructed not to remove

15  them from those trust accounts.

16                   Separately, Your Honor, I understand

17  the issue, and if the Court is not comfortable with

18  that resolution, we would be happy with an order

19  directing Ms. Comer not to -- to hold the funds and

20  not distribute them to anyone, which would not be a

21  mandatory injunction.

22                   But I think those are two ways to

23  avoid the mandatory injunction problem this Court has

24  flagged.  One would be to just order her not to remove

13

1   the funds from the trust accounts of the attorneys

2   that are handling the closing, or the other would be

3   to order her simply to hold the funds and not

4   distribute them to anyone.

5               THE COURT:  All right.  So then, at

6   that point, by the implicit direction, I'm directing

7   attorneys to take custody of funds indefinitely?

8               MR. FREEDMAN:  In the first -- in the

9   first prong, Your Honor, I guess, not indefinitely,

10  but pending resolution of a preliminary injunction

11  motion, yes, Your Honor.

12              THE COURT:  Okay.

13              MR. FREEDMAN:  Your Honor, we've cited

14  case law that shows that the injury here would be

15  irreparable when there is a fraudulent transfer at

16  issue and the defendant is insolvent.  Most directly

17  applicable to that precedent would be the *Mitsubishi*

18  case that we have cited to the Court, where BBIPL,

19  which was a subsidiary of Babcock, owed money to

20  Mitsubishi.  Babcock's parent went into bankruptcy

21  proceedings.  Mitsubishi learned about it, that they

22  would be selling certain assets, and sought an

23  injunction to prevent any sale outside the normal

24  course of business, but to allow fair market value

14

1    transactions if the proceeds were placed in escrow.

2                        The Court found there, Your Honor,

3    that "[t]he threat of a fraudulent transfer will

4    constitute irreparable harm warranting injunctive

5    relief," and found that Mitsubishi's claim for

6    irreparable harm hinged on whether it could show --

7    quoting again -- "a colorable claim that [Babcock]

8    intends to engage in one or more fraudulent transfers

9    in the near future."  It did find that and granted the

10   exact TRO that KMI is seeking here, Your Honor.

11                       We have cited a substantial amount of

12   other authority that goes to the proposition that when

13   there is an equitable claim like fraudulent transfer

14   or an equitable lien, coupled with insolvency, a TRO

15   to preserve the assets is appropriate.  That's the

16   *Stoltz Realty* case we cited, the *Bayard v. Martin* case

17   that we cited that would say, you know, a money

18   judgment would not produce the dollars -- sorry.  That

19   monetary judgments are not adequate when "a money

20   judgment would not produce the dollars," as courts of

21   equity often intervene in cases of insolvency.

22                       Most on point, Your Honor, is the

23   *Destra* case that we have cited from Vice Chancellor

24   Laster, who enjoined the transfer of cash proceeds

CHANCERY COURT REPORTERS

15

1  from a merger transaction pending final disposition of
2  the case.  And in that case, Your Honor, said best by
3  the Vice Chancellor -- and I'm quoting him here --
4  "the most likely remedy is a form of damages.  The
5  problem is that the entities that stand to receive
6  cash from the third-party merger can immediately
7  distribute those proceeds outside of the court's
8  control.  Complicating matters further, the plaintiffs
9  have shown that [defendant] has a history of evading
10  judgments and failing to pay legal obligations.  A
11  meaningful threat that a defendant may render relief
12  meaningless by dissipating assets or removing them
13  from the court's jurisdiction has been held to support
14  preliminary relief."  And, Your Honor, Vice Chancellor
15  Laster directed that -- entered a preliminary
16  injunction directing that all proceeds were to be held
17  in escrow pending resolution of the case.
18          The only two cases that Ms. Comer
19  brings to rebut this Court's authority to enter that
20  kind of a TRO, Your Honor, are *Henson* and *Du Pont*.  In
21  *Henson*, it's a little bit ironic, because counsel for
22  Ms. Comer, Brian Rostocki, who is here before the
23  Court, argued exactly the other side of the case he is
24  arguing now, which is in their papers argued that the

16

threat of a further fraudulent transfer warranted
injunctive relief.  But the difference in *Henson*, key
distinction, the reason the Court denied the relief in
*Henson* is because at oral argument counsel conceded
that issues involving the payment of royalties could
be remedied by damages and, therefore, did not create
a risk of irreparable harm.  Whereas here, no such
concession has been made.  In fact, the opposite is
being stated.

The other case is *Du Pont*.  And the
fundamental distinction between *Du Pont* and this case
is that here, there's a fraudulent transfer claim,
Your Honor.  And *Du Pont* was a jurisdictional
decision, and it found that chancery courts did not
have jurisdiction because there was no equitable
claim.  And some of the relevant quotations from
*Du Pont* would be "[n]o claim ... here" is -- "is made
here that the proposed transfer of HEM's funds is
independently wrongful."  No claim for a trust is
asserted in the specific expenditure.  "HEM is not
presently insolvent, and the proposed dividend ...
will not render it insolvent."  And in that case,
there was no claim for a fraudulent transfer like
there is one here.  Although the Court said, you know,

17

1   there is no claim that it's independently wrongful,

2   here there is one.  And the authority is quite clear

3   that this Court can enter a temporary restraining

4   order in furtherance of avoiding a fraudulent

5   transfer.

6            Your Honor, the claim here that this

7   is a fraudulent transfer is certainly colorable.  As

8   an initial matter, the statutory factors are not

9   exhaustive.  You can look at other things; other

10  courts have.  The *Haining* Court we have cited to the

11  Court looked at the fact that a bankruptcy was filed

12  without notice to the plaintiff.  That happened here

13  too.  Other nonstatutory factors relevant here:  The

14  attempt to move the sale date and the

15  misrepresentations about repayments.  Even as to the

16  factors in the statute itself, Your Honor, we have

17  alleged at least three of them, that they occurred --

18  the sale occurred right after suit was being

19  threatened, the transfer of substantially all the

20  assets, and the debtor is insolvent.

21           Your Honor, in this case here, KMI

22  believes it's shown that there is -- if this Court

23  does not enter a TRO, it will not be able to collect

24  these funds.  And I understand that the Court is

18

1    concerned about the tenancy by the entireties.  And I

2    think the way to resolve that issue is simply an order

3    that affects the funds after they are taken out of the

4    tenancy by the entirety, which is clearly the

5    intention of Ms. Comer because she intends to buy a

6    house in her own name.

7                  And in terms of a mandatory

8    injunction, Your Honor, I think that that can be

9    avoided by either directing it to be -- for it to

10   remain in trust or for her to simply hold the funds

11   and, you know, not expend them until this Court has a

12   further opportunity to rule on this case.  But if the

13   Court has any concerns based on this record, if the

14   Court does not enter the TRO, because the closing is

15   scheduled for the 10th, the relief will be defeated.

16   So we would ask that Your Honor err on the side of

17   caution in this instance and grant the limited TRO

18   that we're seeking here.

19                  Hello.  Did I disconnect?

20                  (Discussion held off the record.)

21                  THE COURT:  It's Joe Slights.  I'm

22   back in.  I did, for some reason, have a dropped call.

23   I'm not sure why.  I'm on a land line.  But, in any

24   event, with realtime, I was able to follow along with

19

```
 1  Mr. Freedman's argument to its conclusion.  So I
 2  didn't miss anything in that regard.
 3                 Unless there's anything further on
 4  behalf of the plaintiff, I'll hear from Mr. Eckard at
 5  this time.
 6                 MR. FREEDMAN:  Nothing more from me,
 7  Your Honor, unless you have any questions.
 8                 THE COURT:  I don't at this time.
 9  Thank you.
10                 Mr. Eckard.
11                 MR. ECKARD:  Yes.  Thank you, Your
12  Honor.  Again, just for purposes of the record, Mark
13  Eckard from Reed Smith for Nicole Bolt Comer.
14                 Your Honor, nothing just said -- and I
15  will be happy to go through some of the facts that
16  were just cited, which, as Your Honor noted, are
17  absolutely disputed.  But nothing just said obviates
18  the fact that this is another attempt by plaintiff to
19  obtain relief to which plaintiff is not entitled.
20  This is a breach of contract claim.  Specifically, a
21  breach of a personal -- an alleged breach of a
22  personal guarantee.  Plaintiff not only pleads for
23  money damages alone; plaintiff pleads for a liquidated
24  certain definite amount of money damages.  There is no
```

1    irreparable harm in this case.  And that was already

2    found by President Judge Jurden, who very clearly

3    found that this case pleads a claim for money damages.

4                  There, in the Superior Court case, the

5    plaintiff unlawfully recorded a lis pendens against

6    our client's property.  That is not proper unless the

7    claim touches upon the land.  And in making her

8    decision, Judge Jurden again found very clearly that

9    this is a case about money damages.

10                  Here, plaintiff literally is asking

11   the Court for proceeds of the sale of what I will call

12   the Autumwood property.  And, Your Honor, the

13   Autumwood property is the property that defendant is

14   selling, and what I call the Westmoreland property is

15   the property that defendant is buying.  Plaintiff has

16   here -- here, plaintiff has literally asked the Court

17   for proceeds from the sale of the Autumwood property

18   to be put into an escrow account to satisfy a

19   potential future judgment, which is the best evidence

20   that this is a case for money damages.  They are

21   literally asking for a pot of money.  The only slight

22   difference between this complaint and the Superior

23   Court complaint is that here, plaintiff has formally

24   pleaded a claim for fraudulent transfer, which,

21

1    although not pleaded as a separate claim in the
2    Superior Court, was the thrust of plaintiff's claim to
3    be allowed to record a lis pendens.  And the complaint
4    does talk about an alleged fraudulent transfer.  And,
5    again, Judge Jurden found clearly that this is a claim
6    for money damages.
7                   I would also point out to Your Honor
8    that the fraudulent transfer claim, it doesn't make
9    sense because plaintiff, as Your Honor has noted,
10   is -- excuse me.  Defendant, as Your Honor has noted,
11   is selling a house or property that is currently held
12   as tenants by the entirety.  And, Your Honor, I asked
13   the closing attorney in this case for a copy of the
14   deed, and I am, indeed -- pardon me.  I am sitting
15   here looking at a deed made the 15th day of March,
16   2012, that is granted to Dudley M. Comer and Nicole
17   Comer, husband and wife.  And in the, what we call the
18   habendum clause of the deed, it says:  To their heirs
19   and assigns, as tenants by the entirety, in fee
20   simple.  And that deed -- again, I apologize this is
21   not in the record.  But it is public record document
22   number 2012-0319-0015194.  And, again, I obtained that
23   from the real estate attorney that is doing the
24   closing of the sale of the Autumwood property.

CHANCERY COURT REPORTERS

22

1              So it doesn't make sense, the

2       fraudulent transfer claim, because defendant, if she

3       were trying to effect a fraudulent transfer, certainly

4       would not take property that is currently held as

5       tenants by the entirety and put it into a property

6       that is in her name only and, therefore, readily

7       available for attachment and execution after a

8       judgment might be issued.

9              Plaintiffs also misread the holding of

10      *Henson v. Sousa*, which relied on Section 1307(a)(3)(a)

11      of the Delaware Uniform Fraudulent Transfer Act to

12      state, "Regardless of whether" -- and I will put in

13      brackets plaintiff -- "Regardless of whether

14      [plaintiff] has articulated a colorable claim of

15      fraudulent transfer, he still bears the burden of

16      showing that he will be irreparably harmed without a

17      TRO."  There, the plaintiff failed to show irreparable

18      harm because, as stated by the Court, the alleged harm

19      at issue in *Henson* "if it exists, can be adequately

20      redressed via money damages."

21              And counsel for plaintiff just made

22      our point in that respect.  *Henson* is directly on

23      point because the issue of diversion of royalty fees

24      in that case could be remedied with money damages.

23

1    And that's what the Court held.

2                    So even if plaintiff here pleads a

3    colorable claim for a fraudulent transfer, just

4    pleading a claim -- a colorable claim for a fraudulent

5    transfer does not constitute the showing of immediate

6    irreparable harm that's required.  Again, this is a

7    claim for money damages.  What do you get if you win?

8    And in this case, plaintiff, if plaintiff wins -- if

9    plaintiff were to win this case, they would get money

10   damages.

11                   And further, plaintiff has not made a

12   sufficient showing of a potential fraudulent transfer.

13   Defendant is selling her property to unrelated third

14   parties pursuant to an arm's-length real estate deal

15   that was negotiated through real estate agents.  The

16   price being received is a fair price for the property.

17   And, in fact, here, plaintiff doesn't say this -- they

18   learned from their mistake in the Superior Court --

19   but in the Superior Court case, plaintiff actually

20   seemed to be pleading that it was a fraudulent

21   transfer because the Autumwood property was selling

22   for higher than market value, which again is

23   backwards.  And defendant then is buying a property, a

24   replacement property, what I call the Westmoreland

1   property, from an unrelated third party pursuant to an
2   arm's-length real estate deal that was negotiated
3   through real estate agents.  And in trying -- they
4   have not shown that defendant is failing to pay her
5   debts as they become due, nor have they shown that
6   plaintiff's liabilities exceed her assets.  And in
7   trying to show that defendant is insolvent, plaintiff
8   is conflating two very different sets of facts.
9               First, plaintiff is conflating the
10  former corporate debt and cash flow difficulties and
11  bankruptcy of Comer Enterprises, Inc. with defendant's
12  personal financial situation.  And, Your Honor, being
13  listed as a co-debtor in a bankruptcy is different
14  than being a debtor.  I just want to make clear that
15  when somebody is listed as a co-debtor, it means that
16  they are somebody that is potentially liable also for
17  certain claims of the bankruptcy debtor.  Nicole Bolt
18  Comer did not file for bankruptcy.
19              So the second thing that plaintiff
20  conflates is financial stress that was occurring at
21  the time of the filing of the Comer Enterprises
22  bankruptcy with defendant's personal situation now.
23  Plaintiff cites numerous times, and discussed here a
24  few times, a text from defendant's husband that was

25

1    obviously at a time when he was obviously under severe

2    financial stress, talking about their dire financial

3    situation.  But plaintiff doesn't exactly highlight

4    the fact that that text was sent in 2019, right around

5    the time that Comer Enterprises, Inc. was filing

6    bankruptcy.

7                    Your Honor, with regard to the balance

8    of harms, it's very -- we would respectfully suggest

9    that it's important for the Court to take note that

10   the harms here would not only affect Nicole Bolt

11   Comer, but they would also affect third parties.

12   There are folks that are buying the Autumwood property

13   that, again, are unrelated third parties.  And there

14   is somebody that is expecting to sell the Westmoreland

15   property.  And, Your Honor, we don't know if that --

16   if the seller is also planning to then take those

17   proceeds and immediately put it into another purchase.

18   And this triggers almost a domino effect of damages

19   and harms to people other than Nicole Bolt Comer.

20                   And, Your Honor, with regard to our

21   arguments about whether or not plaintiff pleads a

22   colorable claim for breach of the personal guarantee

23   of the corporate merchant -- corporate merchant cash

24   advance debt and the issue of usury, we will rest on

1  our papers on that.

2              And I thank Your Honor for hearing me

3  today.

4              THE COURT:  All right.  Thank you.

5              Are there issues with connection?  It

6  appears I've gotten an email, that I'm just now seeing

7  and reading as I speak, from Mr. Brown indicating

8  there might have been some connection issues.

9              Mr. Brown, if you're on the line,

10 perhaps you can weigh in to just bring us up to speed

11 on what you're encountering.

12             (Mr. Brown rejoined the conference

13 call.)

14             MR. ECKARD:  Was Your Honor able to

15 hear my argument?

16             THE COURT:  I was, yes.  My line

17 dropped for a moment, or my connection dropped.  I

18 dialed back in.  And as I stated before you began your

19 presentation, I was able to follow the balance of

20 counsel's argument through the realtime transcript,

21 which was only the conclusion.

22             But I did receive an email just now

23 from Mr. Brown indicating that both he and Mr. Eckard

24 may have dropped off.  And, Mr. Eckard, I don't think

27

 1   that's probably accurate because you've been speaking.

 2   But, Mr. Brown, I hear that you rejoined.

 3              MR. BROWN:  I did, Your Honor.  So,

 4   yes, Mr. Eckard was speaking, and it appeared from my

 5   perspective his line went dead.  I couldn't hear him.

 6   And my line cut out.  I was immediately concerned,

 7   because I thought it would disconnect everybody, as

 8   it's my conference bridge.  So I am glad to hear that

 9   it did not disrupt the proceedings.

10              THE COURT:  No.  And I think

11   Mr. Eckard was not disconnected.  I was able to hear

12   him throughout his presentation.

13              MR. FREEDMAN:  And I was able to hear

14   Mr. Eckard's argument as well.

15              I have a very short rebuttal, if the

16   Court would grant me that time.

17              THE COURT:  Of course.

18              MR. FREEDMAN:  So, Your Honor, in

19   terms of the lis pendens, it's a little bit inaccurate

20   in terms of what transpired.  We did not oppose the

21   motion to remove the lis pendens.  The judge really

22   didn't decide anything with the benefit of briefing.

23   We agreed to withdraw it, and then the judge expressed

24   some concern of why it had been filed in the first

1    place, and that's where those comments were generated.

2                    Subsequent to that -- and we intend to

3    explain to the judge in the Superior Court that there

4    is precedent from this Court, specifically the *Luchi*

5    case that was entered by, I think it was Master in

6    Chancery Griffin and then adopted by the Chancellor,

7    that the filing of a lis pendens is appropriate in a

8    fraudulent transfer claim because the fraudulent

9    transfer itself -- the claim of fraudulent transfer

10   establishes an interest in the property.

11                   I think that's not an issue before the

12   Court right now, but I just wanted to explain that

13   there is a basis for why we filed that lis pendens.

14   But we did agree that the weight of authority kind of

15   cuts against that, and we thought we were better off

16   here in front of this Court.

17                   Your Honor, I have had some more time

18   to think about your mandatory versus prohibitive

19   injunction.  I think another potential way for us to

20   skin that cat, in addition to the ways I have

21   identified before, would be to enter an injunction

22   prohibiting the sale of her interest or her --

23   prohibiting her ability to consummate the transaction

24   unless she were to place the funds in escrow.  And

29

1    that -- her portion of the funds in escrow.  And that

2    would just be an order affecting Ms. Comer and her

3    ability to consummate the sale and sign final

4    documents.  But that would fall off if she were to

5    place the funds in escrow, and that would be a

6    prohibitive injunction, not a mandatory injunction.

7                    Your Honor, the other thing I heard

8    Mr. Eckard say over and over again is that this is a

9    monetary damages case.  He's right and he's wrong.  It

10   is a monetary damages case.  But the case law is clear

11   that in a monetary damages case, when there is a claim

12   for fraudulent transfer coupled with insolvency, the

13   chancery courts are empowered to use temporary

14   restraining orders and preliminary injunctions to help

15   avoid the fraudulent transfer and stop the fraudulent

16   transfer from occurring.  So the fact that there are

17   monetary damages and we're seeking monetary damages,

18   that's irrelevant because there's also a claim for

19   fraudulent transfer and a claim for insolvency, and

20   the case law speaks very clearly that this Court is

21   now empowered to prevent that from going forward.

22                    In terms of insolvency, Your Honor, we

23   made a showing that Ms. Comer is insolvent based on

24   sworn testimony and a pattern of wrongful conduct.

CHANCERY COURT REPORTERS

30

We've shown that she has completely failed to rebut
that presumption with any persuasive evidence that we
have put forward.  We can't possibly prove insolvency
on a temporary restraining order application since we
haven't had an opportunity to do discovery.  But based
on Ms. Comer's prior conduct and what's going on in
this case, if this Court does not enjoin the proceeds
of this sale, then KMI will be out its money and she
will fraudulently avoid this sale.  And that is the
irreparable harm that we're asking this Court to
enjoin to stop a circumstance where Ms. Comer will
fraudulently convey the assets that KMI is meant to
collect on, and then we will be left with an insolvent
debtor.

            And the case law we have cited to the
Court is chock-full of the propriety of that relief
under these circumstances.  So we ask the Court to
enter the TRO.

            THE COURT:  All right, Counsel.

            First off, thanks for your excellent
arguments.  Given the exigencies here, I think it
makes sense to give you my ruling on the motions now
rather than have you wait.  And for reasons I'll
explain in a moment, I'm going to deny both

CHANCERY COURT REPORTERS

 1  plaintiff's motion for a temporary restraining order

 2  and its motion to expedite proceedings.

 3              By way of brief background, on

 4  July 18, 2019, plaintiff, KMI Group Inc., or "KMI,"

 5  acquired from Comer Enterprises Inc./The Allere Group,

 6  or "seller," $184,819 of the seller's accounts

 7  receivable in exchange for $123,213 to be paid to

 8  seller in installments.  This transaction was

 9  memorialized in what the parties refer to as the

10  purchase agreement.

11              The purchase agreement called for

12  accelerated payment of the amounts owed in the event

13  of default, and defendant, Nicole Comer, personally

14  guaranteed the amounts owed in her capacity as

15  seller's owner, agent, and manager.

16              Seller subsequently sought bankruptcy

17  protection, and KMI's loan has not yet been fully

18  repaid.  Upon learning that Ms. Comer now seeks to

19  sell her personal residence, KMI first initiated what

20  the Superior Court deemed to be a misguided attempt to

21  attach a lis pendens on the title of the property.

22  And then, when that was not successful, KMI filed a

23  complaint in this Court and moved simultaneously to

24  expedite proceedings and for a temporary restraining

1    order that would require Ms. Comer to place proceeds

2    from the sale in escrow pending resolution of KMI's

3    breach of contract claim.

4                  The standards for a TRO and a motion

5    to expedite are well-settled in Delaware, and they

6    substantially overlap.  To expedite proceedings, the

7    movant must demonstrate a colorable claim and the

8    existence of immediate irreparable harm.  To obtain a

9    TRO, the movant must demonstrate those same elements

10   and also that a balancing of the equities justifies

11   the restraint.

12                  Turning directly to the motion for a

13   TRO, that extraordinary interim relief is

14   inappropriate on this record for multiple reasons.

15                  First, Ms. Comer has stated under

16   penalty of perjury that she is married and the

17   property at issue is owned by both her and her husband

18   as joint tenants by the entirety.  That allegation is

19   not meaningfully disputed.  It's at paragraph 5 of her

20   declaration.

21                  KMI acknowledges in its opening brief

22   that if Ms. Comer owns her home with her husband as

23   tenants entirety, the property is not subject to

24   attachment by Ms. Comer's creditors.  The implications

1   of this are several, but I'll mention just two here.
2   First, Ms. Comer's husband is most certainly an
3   indispensable party, and yet he has not been joined.
4   Second, if it is true that the property is not subject
5   to post-judgment execution, then there is no colorable
6   claim for fraudulent conveyance and no threat of
7   irreparable harm if the property is sold.
8                   Another threshold problem with the
9   requested TRO is that it is not purely preventative,
10  as plaintiff would have it seem in its papers; there
11  is a mandatory element in what plaintiff is seeking
12  here.  Specifically, plaintiff would have the Court
13  compel Ms. Comer to place proceeds from the sale in a
14  designated escrow account.  That is mandatory relief.
15  And as our Supreme Court made clear in its 2014
16  decision in *C&J Energy Services v. City of Miami*
17  *General Employees*', this Court may order a mandatory
18  injunction only after a trial or on an undisputed
19  factual record.  Neither predicate exists here.
20                  Even if the Court were to look past
21  the absence of an indispensable party or the mandatory
22  relief plaintiff seeks here, KMI's motion for a TRO
23  still falls short.  Distilled to its essence, KMI's
24  claim seeks from Ms. Comer money damages based on a

34

 1   breach of the purchase agreement and the associated

 2   personal guarantee.  KMI admits as much when it

 3   characterizes the irreparable harm flowing from

 4   Ms. Comer's sale of her residence as the prospect of

 5   KMI being left without recourse in the event it

 6   prevails on its breach of contract claim after

 7   Ms. Comer has transferred title to her home and

 8   absconded with the proceeds.  That's a paraphrase

 9   quote from KMI's opening brief in support of the

10   motion.

11               Thus, KMI effectively asks the Court

12   through its TRO to enter a prejudgment attachment of

13   Ms. Comer's assets by holding the proceeds of her sale

14   in escrow.  Under well-established principles of

15   Delaware law, "[e]quitable relief that has the sole

16   function and effect of freezing [] assets in place to

17   make them available to satisfy any possible future

18   money judgment ... is not within the proper exercise

19   of the Court's power."  That's a quote from this

20   Court's 1997 decision in *Uragami v. Century*

21   *International Credit Corporation*.  For that reason,

22   "this Court has consistently held that the power of

23   injunction is not available merely to aid in the

24   enforcement of a future money judgment."  That's

1  another quote, this time from this Court's 2017

2  decision in *Canal View Investment Company v. Beacon*

3  *Canal View*.

4          Ms. Comer's private home bears no

5  relation to the obligation on which KMI seeks to

6  collect, and thus the only possible interest KMI has

7  in the proceeds of its sale is to aid in the

8  enforcement of a future money judgment on a claim at

9  law that has yet to be adjudicated.

10          In many cases, this Court has made

11  clear that when the request for injunctive relief is

12  disconnected to an underlying claim in equity, and is

13  instead an attempt to attach assets for satisfaction

14  of a yet-to-be-adjudicated unrelated legal claim, the

15  request is improper.  Perhaps most notable in that

16  line of authority is then-Vice Chancellor Jacobs' 1989

17  decision in *Du Pont v. HEM Research*.

18          Indeed, the case KMI relies upon in

19  its reply illustrates the point.  In Vice Chancellor

20  Laster's 2017 decision in the *Destra* case, the

21  injunction was not issued on a fraudulent transfer

22  claim, but on a breach of fiduciary duty claim, which

23  sounds in equity as an interim remedy for that breach.

24  There's no underlying claim in equity at issue here.

36

1           KMI argues equitable relief is

2    authorized under the Delaware Uniform Fraudulent

3    Transfer Act, or UFTA, because Ms. Comer is a debtor

4    presumed to be insolvent, and a creditor may obtain an

5    attachment under Section 1308 of that act upon

6    appropriate showing.  But Section 1307(a)(3)(a) of the

7    UFTA makes clear that injunctive relief is "subject to

8    applicable principles of equity."  That's a quote.

9           KMI's only evidence of Ms. Comer's

10   insolvency is an affidavit from Mr. Moshe Lehrer.

11   That affidavit makes much of seller's bankruptcy as

12   evidence of a serial failure to pay debts.  But that's

13   not a reasonable inference.  An entity's bankruptcy

14   filing, which, of course, is a lawful means by which

15   to manage debt, says nothing of the solvency or not of

16   that entity's owners.

17           For her part, Ms. Comer has submitted

18   in her declaration that Mr. Lehrer introduced her to

19   KMI's high-interest loans, that he or his family

20   controls KMI, and that Ms. Comer has since cut ties

21   with Mr. Lehrer due to his attempts to extort money

22   from her and her business.  That, of course, is denied

23   by KMI.  Ms. Comer further attests that she is

24   solvent.  And on this record, I have no way of

37

1   resolving this threshold issue of fact.  Moreover,
2   both of the transactions at issue here appear
3   indisputably to be on arm's-length terms.  There is no
4   meaningful allegation that the transactions themselves
5   are the product of fraud.
6               The colorable claim bar for a TRO is
7   notoriously low.  But it's hard to say that the bar
8   has been cleared here, where the record is a knot of
9   vehement claims and equally vehement denials.  It's
10  also particularly difficult in this context to view
11  the balancing of equities tipping in the movant's
12  favor.
13              In this regard, as an aside, I note
14  that nowhere in the papers submitted does KMI mention
15  the posting of a bond, as required by Rule 65(c),
16  which, in my view, would have to be substantial if a
17  TRO were to issue, given that the requested TRO
18  addresses Ms. Comer's personal residences, both the
19  one she wishes to sell and the one she wishes to buy.
20  Real property is a unique asset, and to deny one the
21  ability to acquire that asset, only later to discover
22  that the restraint was improvidently granted, is a
23  risk that must be addressed with substantial security.
24  But that is not even acknowledged, much less

 1   meaningfully addressed in the papers.

 2                 More to the point, on this record, I

 3   cannot conclude that the harm to KMI in the absence of

 4   a TRO outweighs the harm to Ms. Comer if the TRO were

 5   to be issued improvidently.  Indeed, KMI acknowledges

 6   that the real harm here is that there might be

 7   additional steps required to execute a judgment on the

 8   property that Ms. Comer is to purchase in

 9   Westmoreland.  That there may be additional steps

10   required, on balance, compared to the harm to

11   Ms. Comer if I was to restrain that transaction

12   improvidently, in my view, does not satisfy the

13   "balancing of the harms" element that is essential to

14   KMI's burden.

15                 So for all of these reasons, I'm

16   satisfied that the motion for a temporary restraining

17   order must be denied.

18                 KMI's motion to expedite fails for the

19   same reasons.  The costs of expedition are

20   presumptively unwarranted "unless there is a showing

21   of good cause" to justify them.  That's a quote from

22   this Court's 2014 decision in *Platinum Partners v.*

23   *Echo Therapeutics*.  As noted, to establish good cause,

24   the movant must show a threat of irreparable injury.

39

1    KMI's argument for irreparable injury is predicated

2    exclusively on Ms. Comer's purported insolvency.  But

3    KMI has failed on this record to make a colorable

4    claim of insolvency and, more to the point, has failed

5    to demonstrate that the subject of the alleged

6    fraudulent transfer would be available to creditors if

7    the underlying claims for breach of contract are

8    successful.  Thus, the motion to expedite must also be

9    denied.

10              That concludes my ruling.  I'm going

11   to ask that defense counsel submit a proposed form of

12   order denying the motion for the reasons stated on the

13   record this afternoon, after giving notice of the form

14   of order to plaintiff's counsel.  I'll ask that that

15   be submitted for the Court's consideration by

16   December 16th.

17              While I'm not looking for reargument

18   at this time, I'm happy to answer any questions for

19   the sake of clarification.  So, Mr. Freedman, I will

20   begin with you.  Any questions for clarification?

21              MR. FREEDMAN:  No, Your Honor.  Thank

22   you for the ruling.

23              THE COURT:  All right.  And,

24   Mr. Eckard, any questions?

40

1              MR. ECKARD:  No, Your Honor.  Thank
2    you.
3              THE COURT:  All right.  Well, thank
4    you, Counsel, for your excellent submissions and
5    helpful arguments this afternoon.  Sorry we
6    encountered technical difficulties, but I think we
7    worked our way through them.  So thanks for your
8    indulgence there as well.
9              I wish you all a good day.  Please do
10   stay safe and sane.  And with that, we are adjourned.
11        (Proceedings concluded at 2:25 p.m.)
12
13
14                        - - -
15
16
17
18
19
20
21
22
23
24

41

                              CERTIFICATE
                              ‾‾‾‾‾‾‾‾‾‾‾

            I, DEBRA A. DONNELLY, Official Court

Reporter for the Court of Chancery of the State of

Delaware, Registered Merit Reporter, Certified

Realtime Reporter, and Delaware Notary Public, do

hereby certify that the foregoing pages numbered 3

through 40 contain a true and correct transcription of

the proceedings as stenographically reported by me at

the hearing in the above cause before the Vice

Chancellor of the State of Delaware, on the date

therein indicated, except for the rulings, which were

revised by the Vice Chancellor.

            IN WITNESS WHEREOF I have hereunto set

my hand at Wilmington, this 18th day of December,

2020.


                    /s/ Debra A. Donnelly
                    ---------------------------
                      Debra A. Donnelly
                    Official Court Reporter
                  Registered Diplomate Reporter
                   Certified Realtime Reporter
                     Delaware Notary Public